Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/10/2021 12:09 AM CDT

State of Nebraska, appellee, v. Christian
Estrada Comacho, appellant.
___ N.W.2d ___

Filed June 18, 2021.    No. S-20-619.

1. **Constitutional Law: Witnesses: Appeal and Error.** An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and reviews the underlying factual determinations for clear error.
2. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules and judicial discretion is involved only when the rules make discretion a factor in determining admissibility.
3. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.
4. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
5. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection.
6. **Convictions: Evidence: Appeal and Error.** Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder

of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.

7. **Sentences: Appeal and Error.** Absent an abuse of discretion by the trial court, an appellate court will not disturb a sentence imposed within the statutory limits.

8. **Rules of Evidence: Hearsay: Witnesses: Interpreters.** Where the translator of a defendant's out-of-court verbal or written statements from a foreign language to English is initially shown by the State to be qualified by knowledge, skill, experience, training, or education to perform such translation, and where the translator testifies at trial and is subject to cross-examination, the translation is admissible as nonhearsay under Neb. Rev. Stat. § 27-801(4) (Reissue 2016), and any challenges to the accuracy of the translation go to the weight of the evidence and not to its admissibility.

9. **Constitutional Law: Criminal Law: Trial: Witnesses.** While the Confrontation Clause guarantees a criminal defendant a face-to-face meeting with witnesses appearing before the trier of fact, that guarantee is not an absolute right. But while the face-to-face requirement is not absolute, it cannot be disposed of easily.

10. **Constitutional Law: Trial: Witnesses: Public Policy.** A defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured.

11. **Conspiracy: Hearsay: Rules of Evidence.** Neb. Rev. Stat. § 27-801(4)(b)(v) (Reissue 2016) is applicable regardless of whether the defendant is charged with the conspiracy that supports admission of the statement.

12. **Conspiracy: Rules of Evidence.** Under Neb. Rev. Stat. § 27-801(4)(b)(v) (Reissue 2016), a statement is excluded as nonhearsay if it is more likely than not that (1) a conspiracy existed, (2) the declarant was a member of the conspiracy, (3) the party against whom the assertion is offered was a member of the conspiracy, (4) the assertion was made during the course of the conspiracy, and (5) the assertion was made in furtherance of the conspiracy.

13. **Conspiracy.** A conspiracy is ongoing—such that statements are considered made during the course of the conspiracy—until the central purposes of the conspiracy have either failed or been achieved.

14. **Conspiracy: Hearsay: Rules of Evidence.** Before a trier of fact may consider testimony under the coconspirator exception to the hearsay rule, a prima facie case establishing the existence of a conspiracy must be shown by independent evidence.

15. **Criminal Law: Evidence: Appeal and Error.** When a criminal defendant challenges the sufficiency of the evidence upon which a conviction is based, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

16. **Aiding and Abetting: Proof.** Aiding and abetting requires some participation in a criminal act which must be evidenced by word, act, or deed, and mere encouragement or assistance is sufficient to make one an aider or abettor.

17. **Robbery: Words and Phrases.** A robbery is not completed at the time the robber takes the money or property, and the necessary force, violence, or putting in fear may occur when, immediately after taking the money or property, the robber is carrying the property away or attempting to escape.

18. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.

19. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

20. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Hall County: Andrew C. Butler, Judge. Affirmed.

Mitchell C. Stehlik, of Stehlik Law Firm, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Miller-Lerman, J.

## NATURE OF CASE

Christian Estrada Comacho (Comacho) appeals his convictions and sentences in the district court for Hall County for conspiracy to distribute a controlled substance and for aiding and abetting a robbery. Comacho claims on appeal that the district court violated his right to confrontation when it allowed a witness, who had tested positive for COVID-19 and was experiencing symptoms, to testify via two-way interactive video. He also claims that the court erred when it overruled other evidentiary objections and when it denied his motion for a new trial. He further claims that there was not sufficient evidence to support his convictions and that the court imposed excessive sentences. We affirm Comacho's convictions and sentences.

## STATEMENT OF FACTS

*Charges Against Comacho.*

In the operative information filed June 10, 2020, the State charged Comacho with conspiracy to distribute a controlled substance and robbery. The charges against Comacho arose from an incident that was alleged to have occurred on January 22, 2019. The State's theory of the case was generally that Comacho agreed with others to distribute methamphetamine but that when the "transaction" was actually completed, Comacho took cash from the prospective purchaser but did not provide the methamphetamine.

In its opening statement at trial, the State set forth the narrative that it anticipated the evidence would show to support the charges against Comacho. The general narrative was that police officers investigated a shooting that had occurred in the early hours of January 22, 2019, outside an apartment building in Grand Island, Nebraska. Kent Albrecht had sustained a gunshot wound to the face and was being treated in a hospital. From interviews with Albrecht and two other men—Derek Weaver and Monty Goin—police surmised that the three men had discussed Albrecht's desire to purchase a large quantity of methamphetamine.

Weaver knew Comacho and contacted him regarding Albrecht's intention to purchase methamphetamine. Comacho agreed to assist. Based on his communications with Comacho, Weaver traveled with Albrecht and Goin to Grand Island, where Comacho lived. The three went to Grand Island with the plan that Comacho would connect them with other individuals who would provide the methamphetamine. Albrecht and Weaver picked up Comacho and, at Comacho's direction, drove to the parking lot of an apartment building. When another vehicle entered the parking lot, Comacho left the vehicle driven by Albrecht. After that point, Comacho returned a short while later and told Albrecht that he would need to pay cash up front in order to purchase the methamphetamine. Albrecht had brought $5,000 in cash with him, but told Comacho he would not give him the cash until he saw the methamphetamine. After some back and forth in which the other vehicle left the parking lot and Comacho told Albrecht that the deal was off if he did not pay the cash up front, Albrecht eventually gave the $5,000 cash to Comacho. Comacho walked away from the Albrecht vehicle with the cash toward the other vehicle. Albrecht and Weaver waited with the expectation that Comacho would return with the methamphetamine. However, Comacho did not return, and instead, shots were fired at Albrecht's vehicle and Albrecht sustained a gunshot to his face. The State claimed that after the shooting, Comacho may have left the scene in the other vehicle or, in any event, did not leave with the Albrecht vehicle. Police officers who investigated the shooting and Albrecht's, Weaver's, and Goin's versions of the events that led up to the shooting, executed a search warrant of Comacho's residence and found cash inside a boot.

*Weaver's and Albrecht's Testimony at Trial.*

Weaver and Albrecht both testified at Comacho's trial. Weaver generally testified that in the days prior to January 22, 2019, he had had conversations with two acquaintances, Comacho and Goin. Weaver learned that Goin was looking for someone from whom methamphetamine could be purchased,

and Weaver believed that Comacho could provide methamphetamine. Goin informed Weaver he wanted to purchase a pound of methamphetamine and could pay $5,000 for it. Weaver later learned that Goin was inquring on behalf of Albrecht, who would be purchasing the methamphetamine.

On the afternoon of January 21, 2019, Weaver communicated to Comacho via text messaging that he had a potential purchaser willing to pay $5,000 and that he could come to Grand Island. Comacho replied, "Come thru then." They discussed the amount of methamphetamine needed and arranged a time Weaver and the purchaser could meet with Comacho. Comacho expressed agreement with the plans. Weaver continued communicating with Comacho via text messaging to update plans, and Comacho eventually asked Weaver to pick him up at work. Weaver accompanied Goin to Albrecht's residence, and from there, the three went to Grand Island.

Albrecht testified that in January 2019, he was living in Elm Creek, Nebraska. Goin was a longtime acquaintance of Albrecht's, and in January 2019, Albrecht discussed with Goin the possibility of obtaining some methamphetamine. Albrecht told Goin he was interested in purchasing a pound of methamphetamine and would be willing to pay $5,000 for it. On January 21, Goin informed Albrecht that he had located someone in Grand Island who could provide that quantity of methamphetamine at that price. Goin and Weaver came to Albrecht's residence; Albrecht and Weaver had not met prior to that time. Albrecht offered to drive the three to Grand Island in his vehicle. By the time they arrived in Grand Island, Weaver and Goin informed Albrecht that they would need to pick Comacho up after work at his place of employment. Because there was some time to spare, the three went to wait at a friend's house in Grand Island.

Albrecht further testified that when it was time to pick up Comacho, Weaver went with Albrecht but Goin stayed at the friend's house. It was then close to midnight, and Weaver directed Albrecht to Comacho's place of employment. Albrecht

waited in his vehicle while Weaver went to find Comacho. Sometime later, Weaver returned with Comacho and the two got into Albrecht's vehicle. Comacho directed Albrecht where he should drive, and eventually, they pulled into the parking lot of an apartment building. Comacho directed Albrecht to park at the far end of the lot and said that they would need to wait for the people who had the methamphetamine.

Eventually, Albrecht saw another vehicle pull into the parking lot and park behind his vehicle. Comacho said, "'They're here,'" and he told Albrecht to give him the money so he could get the methamphetamine. Albrecht replied that he would not give Comacho the money until he saw the methamphetamine. Comacho got out of Albrecht's vehicle and went to speak with the occupants of the other vehicle. Comacho returned and told Albrecht that they would not give him the methamphetamine and that they wanted the money first. Albrecht offered to give half of the cash up front and the other half after he had the methamphetamine. Comacho made a call and then told Albrecht they still wanted all the money.

Albrecht and Comacho continued discussing the matter for another several minutes. Albrecht testified that Comacho was becoming angry and continued to say that Albrecht should give him the money. Albrecht became "tired of the whole deal" and "wanted to get it over with," and therefore, he gave the cash to Comacho. Albrecht testified that the $5,000 cash included five $100 bills, with $20 bills making up the remaining balance.

Albrecht testified that after he gave Comacho the cash, Comacho got out of Albrecht's vehicle and walked back in the direction he had walked before. Shortly thereafter, Albrecht heard "three or four" gunshots. Albrecht testified that he thought the others had shot Comacho. Albrecht then heard a few more gunshots. He observed that his driver's-side window had shattered, and he realized that a shot had hit him in the face. Albrecht "felt like [his] face exploded," and he saw blood. Weaver told Albrecht they needed to leave. Albrecht

put the vehicle in reverse and left the parking lot. Albrecht testified that he made no attempt to retrieve his money or to collect the methamphetamine because he did not want to be shot again and he needed to get to a hospital. Albrecht testified that he did not see Comacho or anyone else as he drove out of the parking lot, that he never heard anything more from Comacho, and that he never retrieved his money or received the methamphetamine.

*Testimony by Timothy Champion Via*
*Two-Way Interactive Video.*

Other witnesses at trial included various law enforcement officers who investigated the shooting and the events preceding and surrounding it. One of those witnesses was Timothy Champion, an investigator with the Grand Island Police Department. Champion generally investigated crimes in the child abuse unit, but he became involved in the investigation of the present case because he was fluent in Spanish and was asked to translate portions of a phone call made by Comacho from prison after he had been arrested.

On July 23, 2020, the date the State wished to call Champion to testify in this case, Champion had tested positive for COVID-19 and was experiencing symptoms. The State requested that Champion be allowed to testify by two-way interactive video. Comacho objected to Champion's testifying by video, and he asserted that it would violate his Sixth Amendment right to confrontation if Champion was not required to testify in court.

After the State and Comacho made arguments on the issue, the court determined that Champion would not be allowed to testify in court but that he would testify by two-way interactive video. In reaching this decision, the court noted that the Nebraska Supreme Court had issued orders and guidelines in response to the COVID-19 pandemic and effectively took judicial notice of such orders and guidelines, as it could do. See Neb. Rev. Stat. § 27-201(2) and (6) (Reissue 2016) ("judicially noticed fact must be one not subject to reasonable

dispute in that it is . . . capable of accurate and ready deter-
mination by resort to sources whose accuracy cannot be rea-
sonably questioned . . . at any stage of the proceeding"). The
court further noted that based on those orders and guidelines,
Champion would not be allowed to be in the courtroom. But
the court also noted that this court had "made a firm stance
. . . that the courts are to remain open during this pandemic"
because "courts are a necessary function of government." The
court further noted that neither the State nor Comacho had
requested a continuance of the trial.

The court recognized that it needed to honor Comacho's
constitutional right to confrontation. The court cited prec-
edent which it read to set forth a two-prong test to determine
whether testimony by video would be allowed consistent with
Comacho's right of confrontation. The court stated that the
test was (1) "whether or not this is necessary for public
policy" and (2) whether "the reliability of the testimony is
assured." Applying these standards, the court found that having
Champion testify by video rather than in court was "necessary
for public policy to protect the public" based on, inter alia,
"the current pandemic" and "the guidelines from the Supreme
Court." The court reasoned that if Champion were required
to appear in court, it would expose numerous people to the
coronavirus, including court staff, attorneys, jurors, Comacho,
and others in the courthouse.

Regarding the second prong, regarding whether the reli-
ability of the testimony was assured, the court noted that
Champion was a law enforcement officer and not a victim
of the crimes for which Comacho was being tried. The court
stated that Champion's testimony would be "just an officer giv-
ing a factual scenario." The court further noted that Comacho
would be allowed to cross-examine Champion by video and
that because it was two-way interactive video, Comacho and
his counsel would be able to see Champion and vice versa,
which the court reasoned would support the "face-to-face
requirement" of the constitutional right to confrontation. The

court noted that while such right should not be taken lightly, it was not an absolute right.

When the court announced that it would allow Champion's testimony by two-way interactive video, Comacho asked that it be noted "for the record" that he had "waived his right to a speedy trial previously by written notation in the court file." However, Comacho did not at the time request a continuance.

Champion thereafter testified by two-way interactive video. The State began by asking Champion about his work as a law enforcement officer and then asking whether Champion was fluent in more than one language. Champion testified that he was fluent in Spanish. In response to a question whether he was "certified or anything in Spanish," Champion testified that every year he was required by the police department "to take a proficiency exam" to determine whether he met "the requirement to be considered [a] bilingual officer[]." Champion had met such requirement every year since 2010. He further testified that he had been speaking both English and Spanish for "the majority of [his] life" and that he spoke both languages in his personal and his professional lives.

Champion then testified that on January 24, 2020, he was asked to assist in an investigation by listening to some phone calls that had been made from jail. Because portions of the phone calls were in Spanish, the officer investigating the case wanted Champion to listen and advise whether anything was said that might be helpful to the investigation. Champion testified that he had listened to two calls that were made by Comacho on January 23—one to a woman and one to a man. The State asked Champion about the call to the man, and Champion testified that the call was partially in English and partially in Spanish.

When the State asked Champion to testify regarding what Comacho said during the call, Comacho objected based on "hearsay and foundation." The court heard Comacho's objections outside the presence of the jury. Comacho stated that he did not dispute that his statements would be admissible

as statements of a party opponent. However, he argued that sufficient foundation had not been presented to show that Champion was "qualified by knowledge, skill, experience, training or education to perform the translation" of the Spanish portions of the call. Comacho recognized that Champion had testified that he had been speaking both Spanish and English his whole life, but he argued that Champion had not testified that he had "any sort of qualifications or certifications to specifically provide translations." The court instructed the State to "lay a little more foundation" before asking questions regarding the content of the calls. The court stated that Comacho could renew his objection at that point and that the court would then rule on the objection.

The State then questioned Champion regarding his experience translating Spanish to English. Champion testified that he was 39 years old and that he had been speaking both Spanish and English his entire life. Champion testified that he had assisted others in interpreting from Spanish to English in both personal and professional contexts. He testified that in his law enforcement career, he was often asked to translate and interpret for Spanish-speaking persons, that he did so "[m]ultiple times a week," and that such occasions involved translating both from English to Spanish and from Spanish to English.

Champion addressed the proficiency examinations he had undergone annually. He testified that most proficiency tests involve "translation in some form," but that in his case, "the tester feels I'm proficient enough that we carry on a conversation in Spanish while we're in the same room together." Champion testified that he had passed all such proficiency examinations and that he had been authorized to assist other law enforcement officers by translating Spanish. The State then began questioning Champion regarding the content of the calls made by Comacho. Comacho objected, and the court overruled the objection. The State thereafter questioned Champion over Comacho's continuing objection to Champion's translation from Spanish to English.

Champion testified that during the phone call with the other man, Comacho would go back and forth between using English and Spanish. After telling the other man he was in prison, Comacho told the man "to get rid of a couple of items." Champion testified that the items were "a shirt and a pump." Champion testified that Comacho "was using the Spanish term for shirt," but that Comacho used the English word "pump." Champion testified that he made note of Comacho's instruction to get rid of a "shirt" and a "pump" because it "seemed odd that somebody in jail would be so concerned about those two items being taken and getting — being disposed of." Champion testified that he did not recognize "shirt" and "pump" as being slang terms. However, he reported Comacho's statements regarding getting rid of a shirt and a pump as comments that might be relevant to the other officer's investigation. Champion testified with regard to the "shirt" that Comacho had told the other man to tell a person named "Alex" to "come get his shirt." Champion also testified that Comacho told the other man that "there was money in a pair of black boots" and that the man should "give the money to his mom to hold on to it."

*Other Testimony and Evidence.*

Other testimony presented by the State included that of a law enforcement officer who conducted a search of Comacho's residence. Among the items found in the search was a black boot that contained a "large roll of money." The amount of cash was $2,000 and included "five $100 bills and the rest was $20 bills."

The State also presented testimony by Ryan Sullivan, a criminal investigator with the Grand Island Police Department. As part of his investigation of the shooting of Albrecht and Comacho's involvement therein, Sullivan listened to phone calls that Comacho made from the prison after he had been arrested. During Sullivan's testimony, the court received recordings of the phone calls into evidence without objection by Comacho.

Sullivan testified that because some of what Comacho said was in Spanish and Sullivan did not understand Spanish, he asked Champion to listen to and translate the phone calls. Sullivan testified that Champion had noted Comacho's use of the words "shirt" and "pump." Sullivan testified that in his work investigating crimes involving controlled substances, he had become familiar with slang terminology used by drug users and dealers. He testified that "shirt" is a common description of a certain weight of a controlled substance and that "in Grand Island it's mostly involving methamphetamine." Sullivan also testified that "pump" is a common slang term for a gun.

Sullivan testified regarding information that had been obtained in a search of Comacho's phone. Among the information was a "web history" showing that around 7 p.m. on January 21, 2019, a search had been made for information regarding "'One Pound Pure Organic MSM Sulfur Crystals.'" During cross-examination by Comacho, Sullivan testified that "MSM sulfur crystals" were not an illegal substance and that his only familiarity with the substance was that "it was used as an imitation substance to replace the controlled substance which is trying to be sold."

Other documents generated from the search of Comacho's phone included depictions of Facebook messaging threads between Comacho and other persons. Two exhibits depicting such messaging threads were offered by the State. Exhibit 44 depicted a messaging thread between Comacho and Alex Gallardo, and exhibit 45 depicted a messaging thread between Comacho and Michael Ortiz. The exhibits included messages exchanged between approximately 7 p.m. on January 21, 2019, and approximately 4 a.m. on January 22. Statements in the conversations indicated that Comacho was attempting to arrange a meeting with Gallardo and Ortiz in the same timeframe in which he was making arrangements with Weaver, Goin, and Albrecht.

The State offered exhibit 44 into evidence during Sullivan's testimony. Comacho objected based on hearsay. The court

heard arguments regarding Comacho's objection to exhibit 44 outside the presence of the jury. The argument encompassed both exhibit 44, including messages with Gallardo, and exhibit 45, including messages with Ortiz. The State argued that the exhibits would be admissible under the hearsay exclusion for statements of coconspirators. The State asserted that Gallardo and Ortiz were drawn by Comacho into the conspiracy to distribute a controlled substance and that the exhibits being offered would show that the two were involved in the conspiracy.

Comacho argued the exhibits could not be admitted because at that point in the trial, no evidence had been presented that would show that Gallardo and Ortiz were coconspirators with Comacho. He further argued that Gallardo and Ortiz were not available for cross-examination and that Sullivan's testimony could not establish the two as coconspirators because Sullivan's testimony would not be based on firsthand knowledge. The State argued that testimony from Weaver and Albrecht showed that Comacho made calls to other people while they were in the parking lot of the apartment building and that phone records also showed that Comacho had made calls during that time.

Following the argument, the court overruled Comacho's objection based on its determination that the message exchanges between Comacho and Gallardo and Ortiz were statements of coconspirators and that as such, they were excluded from the definition of hearsay. The State continued with its questioning of Sullivan, and exhibits 44 and 45 were received into evidence over Comacho's objections.

*Conclusion of Trial and Sentencing.*

After Sullivan's testimony was concluded, the State rested its case. The court overruled Comacho's motion for directed verdict on both counts. Comacho thereafter presented no testimony or other evidence in his defense. The court's instructions to the jury included instructions regarding the elements of conspiracy to distribute a controlled substance, the elements of robbery, and the elements of aiding and abetting. With regard

to the charge of robbery, the court instructed the jury that it could find Comacho guilty of robbery, guilty of aiding and abetting a robbery, or not guilty.

The jury found Comacho guilty of conspiracy to distribute a controlled substance and aiding and abetting a robbery. Comacho moved for a new trial on the bases that his right of confrontation was violated when Champion was allowed to testify by video and that there was not sufficient evidence to support the convictions. The court overruled the motion for a new trial.

The court thereafter held a sentencing hearing at which it considered the presentence report and the arguments of the parties. When announcing its sentences, the court found that Comacho was not a suitable candidate for probation because, inter alia, he had failed to comply with terms of probation in recent cases. The court sentenced Comacho to imprisonment for 14 to 18 years for each of the convictions. The court ordered the sentences to be served concurrent with one another and with the sentence that had been imposed in a separate case.

Comacho appeals his convictions and sentences.

## ASSIGNMENTS OF ERROR

Comacho claims that the district court erred when it (1) allowed Champion to testify via two-way interactive video in violation of Comacho's right of confrontation, (2) overruled his objection to Champion's testimony based on lack of foundation for Champion to translate statements from Spanish to English, (3) overruled his hearsay objection and admitted Facebook messages with Gallardo and Ortiz as statements of coconspirators, and (4) overruled his motion for a new trial. Comacho also claims that there was not sufficient evidence to support his convictions and that the district court imposed excessive sentences.

## STANDARDS OF REVIEW

[1] An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation

Clause of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and reviews the underlying factual determinations for clear error. *State v. Montoya*, 305 Neb. 581, 941 N.W.2d 474 (2020).

[2,3] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules and judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Figures, supra*.

[4] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

[5] Apart from rulings under the residual hearsay exception, we review for clear error the factual findings underpinning a trial court's hearsay ruling and review de novo the court's ultimate determination to admit evidence over a hearsay objection. *State v. Martinez*, 306 Neb. 516, 946 N.W.2d 445 (2020).

[6] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Wheeler*, 308 Neb. 708, 956 N.W.2d 708 (2021).

[7] Absent an abuse of discretion by the trial court, an appellate court will not disturb a sentence imposed within the statutory limits. *Id*.

## ANALYSIS

*Champion's Translations of Comacho's Recorded*
*Statements Were Subject to Requirements*
*Regarding Confrontation*
*and Foundation.*

As an initial matter, we note that Comacho's first two assignments of error each concern Champion's testimony regarding the recordings of phone calls Comacho made from prison. The recording itself was received into evidence during Sullivan's testimony, and the apparent purpose of Champion's testimony was to translate portions of the recording in which Comacho spoke in Spanish. We therefore review our precedent regarding statutory and constitutional rules governing admission of a witness' testimony regarding English translations of a defendant's statements made in a different language.

[8] In *State v. Martinez, supra*, we addressed a hearsay objection to translations of statements the defendant made in Spanish in phone calls, text messages, and law enforcement interviews. We noted that the defendant's statements in the original Spanish were clearly nonhearsay under Neb. Rev. Stat. § 27-801(4)(b)(i) (Reissue 2016) which provides that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . his [or her] own statement." With regard to evidence of an English translation of such statements, we held:

> [W]here the translator of a defendant's out-of-court verbal or written statements from a foreign language to English is initially shown by the State to be qualified by knowledge, skill, experience, training, or education to perform such translation, and where the translator testifies at trial and is subject to cross-examination, the translation is admissible as nonhearsay under [§ 27-801(4)], and any challenges to the accuracy of the translation go to the weight of the evidence and not to its admissibility.

*State v. Martinez*, 306 Neb. 516, 530, 946 N.W.2d 445, 458 (2020).

We noted in *Martinez* that we were addressing only the defendant's hearsay objection to the translations; the defendant had made no objection based on the Confrontation Clause at trial, and on appeal, he had abandoned the foundation objection he had made at trial. Nevertheless, we read the holding from *Martinez* quoted above to implicitly address both foundation and confrontation requirements for admission of such evidence. We held translations to be admissible "where the translator . . . is initially shown by the State to be qualified by knowledge, skill, experience, training, or education to perform such translation." *State v. Martinez*, 306 Neb. at 516, 946 N.W.2d at 458. We read this as a foundation requirement for the admission of translations. Furthermore, we recognized that the principles controlling Confrontation Clause analysis applied to the testimony of the translator when we held the translation admissible "where the translator testifies at trial and is subject to cross-examination." *State v. Martinez*, 306 Neb. at 516, 946 N.W.2d at 458.

In the present case, Comacho does not assert on appeal a hearsay objection to Champion's testimony. However, he argues that the district court erred when it allowed Champion's testimony over both his Confrontation Clause and his foundation objections. Our review of Comacho's confrontation and foundation arguments are informed by our holding in *Martinez*.

*District Court Did Not Err When It
Allowed Champion to Testify by
Two-Way Interactive Video.*

Comacho first claims that the district court erred when it overruled his objection to Champion's testimony based on a violation of his right of confrontation when Champion was allowed to testify by two-way interactive video. We conclude that the district court did not err when it overruled Comacho's confrontation objection to Champion's testimony.

We first address the State's argument that the Confrontation Clause did not apply because the substance of Champion's

testimony was merely to translate Comacho's statements in the phone calls, which were admissible as statements by the party opponent. As we held in *State v. Martinez, supra*, translations of a defendant's out-of-court statements are admissible as nonhearsay under § 27-801(4) regarding statements of a party offered against the party. However, as we noted above, we held that such translations were admissible if, inter alia, "the translator testifies at trial and is subject to cross-examination." *State v. Martinez*, 306 Neb. at 530, 946 N.W.2d at 458. We also referred to the importance of the defendant's ability to make "challenges to the accuracy of the translation," *id.*, and we noted in that regard that the defendant "thoroughly examined the translator regarding the translations' correctness [and] had the opportunity . . . to present other evidence bearing on the translations' precision or shortcomings," *State v. Martinez*, 306 Neb. at 526, 946 N.W.2d at 456.

We read *Martinez* as recognizing that the Confrontation Clause applies to testimony translating a defendant's foreign language statements made out of court; in particular, confrontation principles are required to allow the defendant to challenge the accuracy, precision, and shortcomings of the translation. As we stated in *Martinez*, those concerns are met when the translator testifies at trial and is subject to cross-examination. The question presented in this case is whether the constitutional requirement of confrontation is met when such testimony and cross-examination is carried via two-way interactive video rather than in-court testimony.

Comacho contends that the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact and that in the absence of a face-to-face meeting, the Confrontation Clause is violated. See *Coy v. Iowa*, 487 U.S. 1012, 108 S. Ct. 2798, 101 L. Ed. 2d 857 (1988). He further contends that the requirement for a face-to-face meeting is not met by allowing trial testimony remotely by two-way video, citing *U.S. v. Carter*, 907 F.3d 1199 (9th Cir. 2018) (concluding that victim's inability to travel due to

complications of pregnancy did not satisfy finding of necessity to support allowing testimony at trial by two-way video conferencing).

The district court and the State contend that in certain circumstances, the Confrontation Clause is satisfied even in the absence of an in-person, face-to-face meeting. The district court and the State rely in large part on *Maryland v. Craig*, 497 U.S. 836, 850, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990), in which the U.S. Supreme Court recognized that in a narrow set of circumstances, the requirements of the Confrontation Clause may be satisfied absent a physical, face-to-face confrontation but only where (1) the "denial of such confrontation is necessary to further an important public policy" and (2) "the reliability of the testimony is otherwise assured." Comacho recognizes the precedent of *Craig*, but argues that the high bar set forth in that case was not met here.

[9,10] We have examined *Craig* in subsequent cases involving the specific circumstances of that case—that is, a child witness' testimony outside the defendant's physical presence. In *State v. Smith*, 302 Neb. 154, 171, 922 N.W.2d 444, 458 (2019), we described the holding of *Craig* as follows:

> In *Maryland v. Craig*, the Court reasoned that while the Confrontation Clause guaranteed a criminal defendant a face-to-face meeting with witnesses appearing before the trier of fact, that guarantee was not an absolute right. The Court further stated that while the face-to-face requirement was not absolute, it could not be disposed of easily. . . .
>
> Based on its reasoning that a face-to-face confrontation was not an absolute right but could not be disposed of easily, the Court in *Maryland v. Craig* held that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where

the reliability of the testimony is otherwise assured." 497 U.S. at 850.

The district court in this case applied these factors and determined that Comacho's right to confront Champion would be satisfied absent physical, face-to-face confrontation and instead by two-way interactive video.

Regarding the first prong, the court determined that Champion's physical absence from the courtroom was "necessary for public policy to protect the public." The court identified that important public policy as being to respond to the ongoing COVID-19 pandemic and to prevent the spread of the coronavirus. Because Champion had testified positive for COVID-19 and was displaying symptoms, the court noted that Champion's presence in the courtroom could potentially expose numerous people to illness, including court staff, attorneys, jurors, Comacho, and others in the courthouse. To support its determination that an important public policy was being furthered, the court cited guidance from this court which provided, inter alia, that persons displaying symptoms of COVID-19 should not be allowed inside courtrooms.

Regarding whether the reliability of the testimony was otherwise assured, the court noted that Comacho would be allowed to cross-examine Champion by video and that because it was two-way interactive video, Comacho and his counsel would be able to see Champion and vice versa. The court found the arrangement to support the face-to-face requirement of the Confrontation Clause, and the court noted that its determination in this regard relied in large part on the fact that Champion was not a victim of the crimes charged against Comacho and that instead, he was a law enforcement officer who was merely "giving a factual scenario."

We recognize that the application of *Maryland v. Craig*, 497 U.S. 836, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990), has generally been limited to the specific circumstances of a child witness, often a victim of the crime, who would be

traumatized to testify in the presence of the defendant. We also recognize that *Craig* sets a high bar and that while not an absolute right, the right of confrontation should not be taken lightly. However, we think that unique circumstances of this case show that Comacho's right of confrontation was not infringed when the court allowed Champion to testify by two-way interactive video. We emphasize that the specific context of the circumstances under which this trial took place and the specific nature of Champion's testimony indicate that this was a rare case in which the defendant's confrontation rights were satisfied in the absence of physical, face-to-face confrontation.

First, regarding the important public policy required under *Craig*, we agree with the district court's determination that preventing the spread of COVID-19 was an important public policy. As another court has noted:

> Protecting the public health during this pandemic constitutes an important public policy that may be the basis of a finding of necessity. COVID-19 is a highly contagious disease that spreads from person to person. An in-person hearing, with physical, face-to-face confrontation, must take place in a confined space. Such a hearing increases the risk of transmitting the virus.

*Vazquez Diaz v. Commonwealth*, 487 Mass. 336, 350, 167 N.E.3d 822, 838 (2021). We note that our determination in this regard is time-sensitive—that is, the district court's decision must be viewed in the context of the time when the trial took place, which was July 2020. At that time, the coronavirus was very new and knowledge regarding its transmission and ways to limit its spread was much more limited than at the present day or, presumably, than it will be in the future. We emphasize also that it is important to our determination of necessity that in this case, the witness had actually tested positive for COVID-19 and was experiencing symptoms. Champion's being physically absent from the courtroom was clearly shown to be necessary to advance the important public policy of protecting the public health. See *id*. Therefore, we

agree with the court's determination that Champion's absence from the courtroom was necessary to further an important public policy.

Second, regarding whether reliability of the testimony was otherwise assured, we agree with the district court that in light of the specific nature of Champion's testimony, reliability was otherwise assured. The main purpose of Champion's testimony was to translate portions of the phone calls in which Comacho spoke in Spanish. Therefore, as the court noted, this was not testimony in which an assessment of credibility was as vital or as nuanced as it would be for testimony by the victim of the crime charged or by an eyewitness. That is, a physical, face-to-face confrontation was not as vital for Champion's testimony as it would have been for testimony of a different nature, and we think the two-way interactive video used in this case was sufficient to provide necessary confrontation. See *id.* (determining that assurance that testimony was reliable was present with use of two-way video conferencing technology; elements of confrontation other than physical presence were preserved, including "'oath, cross-examination, and observation of the witness'[s] demeanor'"). Comacho was able to cross-examine Champion to test the accuracy of his translations, and Comacho otherwise was afforded the opportunity to present evidence to challenge the accuracy of Champion's translations. Furthermore, Comacho, his counsel, and the jury were able to observe Champion as he testified in real time. We also note that a recording of the calls was received into evidence during Sullivan's testimony and that therefore, the jury was able to listen to the calls and determine whether Champion's translations appeared reliable in context.

We conclude that based on the specific and unique context in which this case was tried and the specific nature of Champion's testimony, the district court did not violate Comacho's right of confrontation when it allowed Champion to testify by two-way interactive video. We reject this assignment of error.

*District Court Did Not Err When It Determined*
*Foundation Was Sufficient to Admit Champion's*
*Testimony Regarding His Translation of*
*Spanish Words Spoken by Comacho.*

Comacho also claims that the district court erred when it overruled his objection to Champion's testimony based on a lack of foundation to support the accuracy of Champion's translation of Spanish to English. We conclude that the district court did not err when it overruled Comacho's foundation objection to Champion's testimony.

As noted above, in *State v. Martinez*, 306 Neb. 516, 530, 946 N.W.2d 445, 458 (2020), we set forth foundation requirements for translation of a defendant's out-of-court statements and stated that foundation is sufficient "where the translator . . . is initially shown by the State to be qualified by knowledge, skill, experience, training, or education to perform such translation." Comacho argues that the court erred when it allowed Champion to testify regarding his translations because there was not sufficient evidence to make the preliminary showing that he was qualified to perform such translation.

Champion initially testified that he was required to take a proficiency examination every year in order to be considered by the police department as a "bilingual officer[]" and that he had met that requirement every year since 2010. He also testified that he had been speaking both Spanish and English for most of his life and that he spoke both languages in both his personal and professional lives. When Comacho objected to Champion's being asked to translate Comacho's statements, the court instructed the State to "lay a little more foundation." Champion thereafter provided more detail regarding how long he had been speaking both Spanish and English, how he had assisted others in translating from Spanish to English in both his personal and professional lives, and the proficiency examinations that he had undergone annually in order to remain authorized by the police department to assist others by providing translation. The district court thereafter overruled

Comacho's foundation objection to Champion's translation-related testimony. Given the facts just recited, we conclude that the district court did not err when it determined that Champion was qualified to testify regarding the English translation of the Spanish content spoken by Comacho.

The foundation requirement under *Martinez* is an initial showing that the translator is "qualified by knowledge, skill, experience, training, or education to perform such translation." 306 Neb. at 530, 946 N.W.2d at 458. This standard does not require any particular type of training, education, or certification to provide translation as compared to one who is serving as an official interpreter of in-court testimony. Instead, it requires a showing that the translator's individual knowledge, skill, experience, training, or education is sufficient to indicate that the witness is qualified for the purposes for which he or she is testifying. As noted above, in this case, Champion's experience providing translations between Spanish and English in both his personal and professional lives were sufficient to show he was qualified to provide the translations needed in this case. We reject this assignment of error.

*District Court Did Not Abuse Its Discretion*
*When It Admitted Facebook Messages.*

Comacho next claims that the district court erred when it overruled his hearsay objections to transcriptions of Facebook messages Comacho exchanged with Gallardo and with Ortiz. We conclude that the district court did not err when it overruled Comacho's hearsay objections.

The court admitted the Facebook messages as being a combination of Comacho's own statements being offered against him and the statements of Gallardo and Ortiz as coconspirators. Comacho contends that the State did not establish a conspiracy as foundation to admit Gallardo's and Oritz' statements in the Facebook messages under the hearsay exception for statements of coconspirators.

[11-13] Section 27-801(4)(b)(v) provides that "[a] statement is not hearsay if . . . [t]he statement is offered against a

party and is . . . a statement by a coconspirator of a party dur-
ing the course and in furtherance of the conspiracy." We have
held that § 27-801(4)(b)(v) is applicable regardless of whether
the defendant is charged with the conspiracy that supports
admission of the statement. See *State v. Torres*, 283 Neb. 142,
812 N.W.2d 213 (2012). We have stated:

> Under this rule, a statement is excluded as nonhearsay if
> it is more likely than not that (1) a conspiracy existed,
> (2) the declarant was a member of the conspiracy, (3) the
> party against whom the assertion is offered was a member
> of the conspiracy, (4) the assertion was made during the
> course of the conspiracy, and (5) the assertion was made
> in furtherance of the conspiracy.

*State v. Britt*, 293 Neb. 381, 398-99, 881 N.W.2d 818, 833
(2016). We further stated, "It is well established that a con-
spiracy is ongoing—such that statements are considered made
during the course of the conspiracy—until the central purposes
of the conspiracy have either failed or been achieved." *Id.* at
399, 881 N.W.2d at 833.

[14] Before a trier of fact may consider testimony under the
coconspirator exception to the hearsay rule, a prima facie case
establishing the existence of a conspiracy must be shown by
independent evidence. *State v. Torres, supra*. We have stated
that the phrase "prima facie" can "'probably be defined only in
terms of sufficient evidence to permit the trial court reasonably
to infer that there existed a conspiracy.'" *State v. Copple*, 224
Neb. 672, 693, 401 N.W.2d 141, 156 (1987) (quoting *State v.
Thompson*, 273 Minn. 1, 139 N.W.2d 490 (1966)), *abrogated
on other grounds, State v. Reynolds*, 235 Neb. 662, 457 N.W.2d
405 (1990). We have further stated:

> "The requirement of prima facie proof is less stringent
> than that of a preponderance of the evidence. The former
> requires only enough evidence to take the question to the
> jury whereas the latter requires 'proof which leads the
> jury to find that the existence of the contested fact is more
> probable than its nonexistence.'"

*Id*. (quoting *United States v. Trotter*, 529 F.2d 806 (3d Cir. 1976)).

We have noted that on appellate review, we look to the entire record rather than only what was in evidence at the time the statements were admitted. We said in *State v. Hansen*, 252 Neb. 489, 498-99, 562 N.W.2d 840, 848 (1997):

> Regardless of whether a prima facie case of conspiracy had been established at the time [the coconspirator's] statement was first introduced, we conclude that the sum of the evidence submitted at trial, considered independently from the declaration in question, established a prima facie case of a conspiracy between [the coconspirator] and [the defendant]. As such, the declaration would ultimately have been admissible under the coconspirator exception to the hearsay rule.

Comacho argues that the district court erred in this case because its determination that Gallardo, Ortiz, and Comacho were coconspirators relied largely on the Facebook messages themselves. He asserts that the statements sought to be admitted cannot be part of the evidence to support the initial finding of a conspiracy.

We stated in *State v. Bobo*, 198 Neb. 551, 557, 253 N.W.2d 857, 861 (1977):

> The purpose of requiring that the conspiracy be established by independent evidence is to prevent the danger of hearsay evidence being lifted by its own bootstraps, i. e., relying on the hearsay statements to establish the conspiracy, and then using the conspiracy to permit the introduction of what would otherwise be hearsay testimony in evidence.

See, also, *State v. Hudson*, 279 Neb. 6, 775 N.W.2d 429 (2009); *State v. Gutierrez*, 272 Neb. 995, 726 N.W.2d 542 (2007), *disapproved on other grounds, State v. Britt, supra*. We have also rejected a finding of conspiracy based solely on the statements themselves. In *State v. Myers*, 258 Neb. 300, 310, 603 N.W.2d 378, 387 (1999), we stated:

[O]ur review of the record reveals that the conspiracy . . . can only be proved by the hearsay statements themselves. Thus, the State has failed to make a prima facie showing of the existence of the conspiracy . . . separate and apart from the hearsay statements. Consequently, the statements . . . cannot be considered "nonhearsay."

However, although the statements themselves cannot be the sole evidence to support the existence of conspiracy, the statements can be part of the determination so long as there is also evidence independent of the statements to show a conspiracy. See *Bourjaily v. United States*, 483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987) (applying similar federal rule of evidence and stating that in determining whether statement is admissible as statement of coconspirator, court may consider statement itself). See, also, *State v. Pullens*, 281 Neb. 828, 844, 800 N.W.2d 202, 219 (2011) (citing *Bourjaily, supra*, with approval for proposition that "there is no prohibition against so-called bootstrapping in making preliminary determinations" of admissibility).

In this case, the statements were some of the evidence of a conspiracy among Comacho, Gallardo, and Ortiz. There was also independent evidence of this conspiracy. We note that Albrecht's and Weaver's testimony regarding the events that occurred in the parking lot, as well as the events that led them to the parking lot, show that Comacho was working with at least one other individual. Both testified that Comacho was communicating with another person or persons and that Comacho was directing them to a location where they would meet with others to provide the methamphetamine. They also testified that when they were in the parking lot, another vehicle pulled up and Comacho went to speak with the person or persons in the other vehicle. And they testified that Comacho made calls to another person when Albrecht refused to pay the cash before getting the methamphetamine. Finally, their testimony indicated that Comacho had gone in the direction of the other occupied vehicle when the shots were fired at Albrecht's

vehicle. Furthermore, without considering the statements in the messages themselves, the metadata of the messages obtained in Sullivan's search of Comacho's phone indicated that Comacho was communicating with both Gallardo and Ortiz in the hours immediately preceding and following Comacho's meeting with Albrecht and Weaver and the incidents in the parking lot. Such evidence supported a finding that Comacho was involved in a criminal conspiracy involving Gallardo and Ortiz. We believe that a conspiracy involving Comacho, Gallardo, and Ortiz was shown whether the object of the conspiracy was to distribute methamphetamine or to rob Albrecht of the cash or if the object of the conspiracy evolved from one to the other over time.

Based on this evidence, we determine that the district court did not abuse its discretion when it allowed the messages over Comacho's hearsay objection. We reject this assignment of error.

## There Was Sufficient Evidence to Support Comacho's Convictions.

Comacho next claims that there was not sufficient evidence to support either of his convictions. We conclude that there was sufficient evidence to support the jury's verdicts.

[15] In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020). When a criminal defendant challenges the sufficiency of the evidence upon which a conviction is based, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

*Conspiracy to Distribute Controlled Substance.*

With regard to Comacho's conviction for conspiracy to distribute a controlled substance, under Neb. Rev. Stat. § 28-202(1) (Cum. Supp. 2020):

> A person shall be guilty of criminal conspiracy if, with intent to promote or facilitate the commission of a felony:
>
> (a) He agrees with one or more persons that they or one or more of them shall engage in or solicit the conduct or shall cause or solicit the result specified by the definition of the offense; and
>
> (b) He or another person with whom he conspired commits an overt act in pursuance of the conspiracy.

The felony the State alleged to be the subject of the conspiracy in this case was distribution of a controlled substance, methamphetamine, which is a felony under Neb. Rev. Stat. § 28-416(2) (Cum. Supp. 2020). In particular, the State contends that Comacho participated in a scheme whereby Comacho arranged to find sellers to sell methamphetamine to Albrecht.

Comacho contends that there was no evidence that he agreed to sell methamphetamine to Albrecht; he argues that although there was evidence of a conspiracy among Albrecht, Weaver, and Goin, there is no evidence he agreed to be part of that conspiracy. Instead, he notes evidence that he may have intended to sell Albrecht "MSM sulfur crystals" instead of methamphetamine.

However, the testimony of Weaver and Albrecht indicates that Comacho expressed his agreement to take part in the conspiracy to carry out a sale of methamphetamine. The evidence in this case indicates that Comacho spoke with both Weaver and Goins about setting up a purchase for methamphetamine. Although there was evidence from which it could be found at a certain point that Comacho no longer intended to take part in the distribution of methamphetamine, the jury could reasonably infer that prior to that time, Comacho was conspiring to distribute methamphetamine to Albrecht, Weaver, and Goin and had taken overt steps to do so.

Viewing the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to support Comacho's conviction for conspiracy to distribute a controlled substance. We therefore reject this assignment of error.

*Aiding and Abetting a Robbery.*

[16] Under Neb. Rev. Stat. § 28-324(1) (Reissue 2016), "A person commits robbery if, with the intent to steal, he forcibly and by violence, or by putting in fear, takes from the person of another any money or personal property of any value whatever." Comacho was convicted of aiding and abetting a robbery. Neb. Rev. Stat. § 28-206 provides that "[a] person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender." Aiding and abetting requires some participation in a criminal act which must be evidenced by word, act, or deed, and mere encouragement or assistance is sufficient to make one an aider or abettor. *State v. Stubbendieck*, 302 Neb. 702, 924 N.W.2d 711 (2019).

Comacho argues that a robbery was not proved, because at the time Albrecht gave Comacho the cash, Albrecht did so voluntarily, and that therefore, Comacho did not take the cash from him "forcibly and by violence, or by putting in fear." See § 28-324(1). He further argues that there was no direct evidence that he fired the shots at Albrecht or that he was even present when the shots were fired.

[17] We have recognized that a robbery is not completed at the time the robber takes the money or property and that the necessary force, violence, or putting in fear may occur when, immediately after taking the money or property, the robber is carrying the property away or attempting to escape. See *State v. Bell*, 194 Neb. 554, 233 N.W.2d 920 (1975). In *Bell*, the defendant took a cash register from a gas station while the attendant was not looking. When the attendant saw what the defendant had done, the attendant attempted to retrieve the cash register and the defendant struck and pushed

the attendant. We concluded on appeal that although the defendant had already removed the cash register from the station, the robbery was not yet complete because an escape with the stolen property was an integral part of the robbery. In *Bell*, we cited with approval the following from *People v. Anderson*, 64 Cal. 2d 633, 414 P.2d 366, 51 Cal. Rptr. 238 (1966):

> "[A] robbery is not completed at the moment the robber obtains possession of the stolen property and . . . the crime of robbery includes the element of asportation, the robber's escape with the loot being considered as important in the commission of the crime as gaining possession of the property. . . .
>
> "Accordingly, if one who has stolen property from the person of another uses force or fear in removing, or attempting to remove, the property from the owner's immediate presence, as defendant did here, the crime of robbery has been committed."

194 Neb. at 556, 233 N.W.2d at 922.

In this case, although the shots were fired after Comacho had obtained the cash from Albrecht, the jury could reasonably find that the shots were being fired in order to allow the robber to remove the cash from Albrecht's presence and to prevent Albrecht from attempting to retrieve the cash. Firing shots at Albrecht could be found to be use of force against Albrecht or putting him in fear in order to complete the taking of the cash. Because Comacho was convicted as aiding and abetting a robbery, it did not matter whether Comacho was the shooter. The robbery involved both taking the cash from Albrecht with or without force or fear and taking it out of his presence. The necessary element of use of force or putting in fear was part of the phase of the robbery in which the money was being taken out of Albrecht's presence. The entire incident constituted a robbery, and Comacho aided in its commission.

Viewing the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to support

Comacho's conviction for aiding and abetting a robbery. We therefore reject this assignment of error.

*District Court Did Not Err When It Overruled Motion for New Trial.*

Comacho claims the district court erred when it overruled his motion for a new trial. Comacho argued for a new trial based on his claims that Champion's testimony by two-way video violated his right of confrontation and that there was not sufficient evidence to support the verdicts. Because we rejected those arguments above, we also conclude the court did not err when it overruled Comacho's motion for a new trial based on the same arguments.

*District Court Did Not Abuse Its Discretion When Imposing Sentences.*

Comacho finally claims that the district court imposed excessive sentences. He argues that the court did not adequately consider relevant mitigating factors, particularly his substance abuse issues and background. We find no abuse of discretion in the sentencing.

Comacho was convicted of conspiracy to distribute a controlled substance. Section 28-202(4) provides, "Conspiracy is a crime of the same class as the most serious offense which is an object of the conspiracy, except that conspiracy to commit a Class I felony is a Class II felony." Distribution of a controlled substance, methamphetamine, is a Class II felony under § 28-416(2)(a). Therefore, conspiracy to distribute a controlled substance is a Class II felony. Comacho was also convicted of aiding and abetting a robbery. Section 28-206 provides that a person who aids and abets another to commit any offense may be punished as if he were the principal offender, and robbery is a Class II felony under § 28-324(2). The sentencing range for a Class II felony is imprisonment for a minimum of 1 year and a maximum of 50 years. Neb. Rev. Stat. § 28-105 (Cum. Supp. 2018).

The district court sentenced Comacho to imprisonment for 14 to 18 years for each conviction, and the court ordered the sentences to be served concurrent with one another and with the sentence imposed in another case. The sentences imposed by the court were therefore within statutory limits.

[18] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020). We therefore consider whether the court abused its discretion.

[19,20] In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

Comacho argues that the court failed to give adequate weight to mitigating factors, most notably his substance abuse issues. He acknowledges his significant criminal history but argues that the offenses largely involved controlled substances or were committed while he was under the influence of controlled substances. He argues that instead of imposing a lengthy sentence of imprisonment, the court should have imposed a sentence of probation that included treatment to address his substance abuse issues. Comacho notes that prior to a relapse that resulted in the events that gave rise to his current convictions, he had recently had a 3-year period of sobriety in which he had not engaged in criminal activity.

Comacho made similar arguments at the sentencing hearing. Before imposing the sentences, the court stated that it had considered all the relevant factors set forth above, and the court specifically addressed Comacho's substance abuse issues. However, the court found that Comacho was not a suitable candidate for probation, and it noted various factors to support that finding, especially the fact that Comacho had failed to comply with the terms of probation in prior cases. The court noted that the relapse that led to the current convictions showed an escalation in criminal conduct in which a person was shot and that "[h]ad this situation turned out slightly different, [Comacho] could have potentially been on trial for a murder charge." The court further noted that while in custody, Comacho would have opportunities for treatment.

We note that the sentences of imprisonment for 14 to 18 years were in the lower part of the sentencing range of 1 to 50 years for the offenses of which Comacho was convicted. From the entirety of the court's remarks, it did not ignore the mitigating factor urged by Comacho, and we find no abuse of discretion in the sentences imposed. We reject Comacho's claim that the district court imposed excessive sentences.

## CONCLUSION

We conclude that the district court did not err when it allowed Champion to testify via two-way interactive video over Comacho's confrontation and foundation objections. We also conclude that the court did not err when it overruled Comacho's hearsay objection to the Facebook messages with Gallardo and Ortiz or when it overruled Comacho's moton for new trial. We further conclude that there was sufficient evidence to support Comacho's convictions and that the court did not abuse its discretion in sentencing Comacho. We therefore affirm Comacho's convictions and sentences.

Affirmed.

Heavican, C.J., not participating.