Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/01/2022 09:08 AM CDT

State of Nebraska, appellee, v.
Kenneth W. Grant, Jr., appellant.

___ N.W.2d ___

Filed January 14, 2022.    No. S-20-915.

1. **Criminal Law: Courts: Appeal and Error.** In an appeal of a criminal case from the county court, the district court sits as an intermediate court of appeals.
2. **Courts: Appeal and Error.** Both the district court and a higher appellate court generally review appeals from the county court for error appearing on the record.
3. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.
4. **Evidence: Appeal and Error.** In considering a claim of insufficient evidence, an appellate court will not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact.
5. **Convictions: Evidence: Appeal and Error.** Absent prejudicial error, a conviction will generally be affirmed so long as the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the elements of conviction beyond a reasonable doubt.
6. **Constitutional Law: Judgments: Appeal and Error.** Whether the conduct at issue was constitutionally protected is a question of law, and an appellate court will review the district court's rulings on those issues de novo.
7. **Sentences: Appeal and Error.** Absent an abuse of discretion by the trial court, an appellate court will not disturb a sentence imposed within the statutory limits.
8. **Judges: Words and Phrases.** A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable,

unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.

9. **Constitutional Law.** The parameters of the constitutional right to freedom of speech are the same under both the 1st Amendment to the U.S. Constitution, applicable to the states via the 14th Amendment, and the Nebraska Constitution.

10. **Constitutional Law: Criminal Law.** The parameters of the constitutional right to freedom of speech under the 1st Amendment to the U.S. Constitution, applicable to the states via the 14th Amendment, and the Nebraska Constitution both mean that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content and limits the State's ability to prosecute certain criminal offenses when such prosecution entails content control involving protected speech.

11. **Constitutional Law.** The broad protections afforded by the federal and state Constitutions are not absolute.

12. ____. The general rule against government control over the content of speech does not apply to certain well-defined and narrowly limited categories of expression. These speech categories are unprotected.

13. ____. Unprotected categories of speech are thought to form no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.

14. **Constitutional Law: Criminal Law: Libel and Slander: Obscenity.** Categories of content that can be proscribed include libel, obscenity, incitements to imminent lawlessness, true threats, and fighting words.

15. **Constitutional Law.** The government may restrict protected speech through reasonable restrictions on the time, place, and manner of speech, and even a content-based restriction can be upheld if it satisfies the requisite standard of scrutiny.

16. **Judgments: Appeal and Error.** Where the record adequately demonstrates that the decision of a trial court is correct, although such correctness is based on a ground or reason different from that assigned by the trial court, an appellate court will affirm.

17. **Constitutional Law.** In order to bring a claim for violation of the federal or state constitutional guarantees of free speech, the alleged violation must involve state action. The free speech provisions of the federal and state Constitutions were not intended to guard against private interference or restrain private conduct.

18. ____. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.

19. **Convictions: Ordinances: Judicial Notice: Complaints: Appeal and Error.** Where an appellant assigns as error the insufficiency of the evidence to sustain a conviction under a municipal ordinance, an appellate court will not take judicial notice of a municipal ordinance not in the record, but, instead, may apply the ordinance's text as reproduced in the State's long-form complaint.

20. **Ordinances: Complaints.** Absent anything to the contrary, the language of a city ordinance as reproduced in the State's long-form complaint is to be given its plain and ordinary meaning.

21. **Constitutional Law.** Where a law is content neutral on its face, the court must then determine the forum in which the speech takes place, as the government's ability to regulate the time, place, and manner of speech varies according to the type of forum.

22. ____. Speech may take place in a traditional public forum, in a designated public forum, in a nonpublic forum, or on private property.

23. ____. Traditional public forums are those places which are owned by the government and historically associated with expression, such as public streets, sidewalks, and parks, including those which run through residential neighborhoods, whereas designated public forums are those that have not been historically associated with expression but which the government has opened for such use, such as civic auditoriums or public theaters.

24. ____. Nonpublic forums include government-owned property that is not a traditional or designated public forum, such as government offices and military bases.

25. **Property: Words and Phrases.** Private property is property which is protected from public appropriation, over which the owner has exclusive and absolute rights.

26. **Constitutional Law: Public Health and Welfare: Disturbing the Peace.** The police power of a state extends beyond health, morals, and safety, and comprehends the duty, within constitutional limitations, to protect the well-being and tranquility of a community, including the power to prevent disturbing noises.

27. **Constitutional Law.** The right to be let alone is one of the rights most valued by civilized society. The right to avoid unwelcome speech has special force in the privacy of the home and its immediate surroundings.

28. ____. In either a traditional or designated public forum, the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions (1) are content neutral as to both subject matter and viewpoint, (2) are narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternative channels for communication of the information.

29. **Constitutional Law: Criminal Law: Ordinances: Public Health and Welfare.** The requirement of narrow tailoring under the time, place, and manner test is satisfied so long as the ordinance promotes a substantial government interest that would be achieved less effectively absent the regulation, such as deterring conduct inimical to public health, decency, and order, or the tranquility of a neighborhood.

30. **Constitutional Law: Ordinances.** An ordinance restricting the volume of music has no effect on the quantity or content of that expression beyond regulating the extent of its amplification.

31. **Criminal Law: Convictions: Evidence: Appeal and Error.** When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

32. **Constitutional Law: Assault: Intent: Proof.** Threats in a menacing manner, when reviewed separately from the crime of assault, render unlawful a promise of punishment, reprisal, or distress, coupled with a showing of intention to do harm.

33. **Sentences.** The first step in analyzing whether a sentence is excessive is to examine the statutory limits on penalties for such offenses. If the sentence imposed is within statutory limits, the second step is to review for an abuse of discretion.

34. **Sentences: Appeal and Error.** In reviewing whether an abuse of discretion occurred during sentencing, an appellate court determines whether the sentencing court considered and applied the well-established factors and any applicable legal principles in determining the sentence to be imposed.

35. **Sentences.** When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.

36. ____. The sentencing court is not limited to any mathematically applied set of factors, but the appropriateness of the sentence is necessarily a subjective judgment that includes the sentencing judge's observations of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Lancaster County, DARLA S. IDEUS, Judge, on appeal thereto from the County Court

for Lancaster County, Laurie J. Yardley, Judge. Judgment of District Court affirmed.

Joe Nigro, Lancaster County Public Defender, and James Sieben for appellant.

Yohance L. Christie, Lincoln City Attorney, and Marcee A. Brownlee for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Heavican, C.J.
The appellant, Kenneth W. Grant, Jr., accused of shouting in a loud, menacing, and persistent manner from his apartment's balcony at persons across the street, was convicted of disturbing the peace and of assault or menacing threats, both in violation of city ordinances in Lincoln, Nebraska. He asks us to overturn those convictions and their resulting 10-day jail sentences.

We do not analyze whether Grant's speech included fighting words or true threats, because even if Grant's speech was protected, we conclude the State may regulate it through reasonable restrictions on the time, place, and manner of speech. Thus, we affirm Grant's 10-day jail sentence for that conviction.

We find that Grant's conviction for assault or menacing threats was supported by sufficient evidence. We also affirm that conviction.

## I. BACKGROUND
Grant was charged with violating two provisions under the Lincoln Municipal Code, sections "9.12.010A" and "9.20.050." The complaint alleged that Grant had "[i]ntentionally or knowingly disturb[ed] the peace and quiet of . . . Gregory Lee Patterson and Jennifer Sue Ponce" and that he had "[i]ntentionally or knowingly threaten[ed] [Ponce] in a menacing

manner, attempt[ed] to strike her, or place[d] . . . her in fear or apprehension of imminent bodily harm . . . ." Grant pled not guilty to both charges.

At a bench trial, the State called three witnesses, beginning with one of the alleged victims, Jennifer Sue Ponce. She averred that on the day in question, she had been working as a professional painter. While painting a house in Lincoln with a colleague, Ponce heard a man shouting from across the street. She identified that man in court as Grant. She said that Grant yelled "vulgar things" at them as he stood on an apartment balcony about 50 yards away. Grant said, for example, that they were "'doing a shitty job[,] a half-ass job'" of painting, that they were "'never . . . there early enough,'" that they "'shouldn't even [have] be[en] doing that kind of work,'" and that they "'[didn't] even know what [they were] doing.'"

Grant continued to shout in this manner for some period of time, between a "half an hour" and "an hour or so," and his vulgarity increased with time. Specifically, he threatened to "'put bullets in your boyfriends.'" And he also made lewd comments about Ponce's body, yelling, "'Nice' . . . 'ass,'" and "'Your tits are hanging out.'" When asked whether she had felt threatened by Grant's comments, Ponce offered mixed responses, answering "[y]es," that she had felt threatened, but also clarifying that she had not been concerned for her safety, "just because he wasn't coming across — he wasn't off of his balcony. But, if he would've came off the balcony, probably, yes." Ponce acknowledged that while Grant had threatened others, he had not directly threatened to shoot her or her colleague. Still, feeling "[v]iolated" and "disturbed," and frustrated that her work was being interrupted, Ponce had called the police.

Gregory Lee Patterson, another alleged victim, testified next. A resident of the house neighboring the one Ponce had been painting, he spent portions of the day in question smoking cigarettes on his front porch. While there, Patterson heard the vulgar things Grant had "loud[ly]" said to Ponce and her

colleague. Patterson also recalled Grant's shouting of racial epithets at him. Patterson recounted Grant's shouts of "'Fuck all them [racial epithet]'" and "'Kill them all' and 'send them back to Africa.'" Grant had also shouted, "'Yeah, I'd kill them [racial epithet], too. I'd kill him [Patterson], too.'"

When asked whether Patterson viewed Grant's words on the day in question as threatening, Patterson testified that "I was the only black person there, so [Grant's statement about killing] had to be towards me." However, Patterson acknowledged that "this ain't the first time [Grant's] said something about killing blacks and Mexicans"; "he was doing this all the time." Patterson also recounted that "this ain't nothing new. He'd always sit on the porch and holler racial slurs, all the time, towards me, towards the neighbors, even towards people walking down the street."

The State's final witness was Breanna Callese, the officer with the Lincoln Police Department who responded to Ponce's call. Callese said that during her investigation, Grant admitted to calling Patterson a racial epithet and to telling Ponce that "he was going to . . . 'light them up.'" Grant maintained, however, that such expression was protected by his "[F]irst [A]mendment right." Unpersuaded, Callese cited him with disturbing the peace.

Callese recalled being summoned again to the same location a short time later because Grant's shouting had apparently continued unabated. This time, Grant claimed that his yelling had not been directed at Ponce and Patterson, but, rather, that it had been directed into his phone at his sister. Callese refrained from citing Grant with a second count of disturbing the peace. Grant was officially charged on July 26, 2019, with one count of disturbing the peace and an additional count of assault or menacing threats.

Grant called no additional witnesses and offered no other evidence of his own. At the close of the State's evidence, the county court for Lancaster County found Grant guilty of both counts alleged in the complaint. The county court then

sentenced him to 10 days in jail for each conviction, the sentences to run concurrently.

After sentencing, Grant perfected a timely appeal to the district court for Lancaster County. Sitting as an intermediate court of appellate review, that court affirmed. Grant again perfected a timely appeal, and we moved his appeal to our docket.

## II. ASSIGNMENTS OF ERROR

Grant assigns that the district court erred in affirming his convictions and sentences. Specifically, Grant contends that (1) the speech for which he was convicted of disturbing the peace was constitutionally protected, (2) there was insufficient evidence adduced at trial to support his convictions, and (3) his sentences were excessive.

## III. STANDARD OF REVIEW

[1-3] In an appeal of a criminal case from the county court, the district court sits as an intermediate court of appeals.[1] Both the district court and a higher appellate court generally review appeals from the county court for error appearing on the record.[2] When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[3]

[4-6] In considering a claim of insufficient evidence, an appellate court will not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence.[4] Such matters are for the finder of fact.[5] Absent prejudicial error, a conviction will generally be affirmed so long as the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the elements of conviction

---

[1] See *State v. Jennings*, 308 Neb. 835, 957 N.W.2d 143 (2021).

[2] *Id.*

[3] See *id.*

[4] See *State v. Estrada Comacho*, 309 Neb. 494, 960 N.W.2d 739 (2021).

[5] *Id.*

beyond a reasonable doubt.[6] Whether the conduct at issue was constitutionally protected, however, is a question of law, and an appellate court will therefore review the district court's rulings on those issues de novo.[7]

[7,8] Absent an abuse of discretion by the trial court, an appellate court will not disturb a sentence imposed within the statutory limits.[8] A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.[9]

## IV. ANALYSIS

### 1. Conviction for Disturbing the Peace

Grant assigns, first, that his conviction for disturbing the peace was in error because the speech underlying his conviction was protected by U.S. Const. amend. I and Neb. Const. art. I, § 5. Grant argues that because his speech was protected, it could not be criminally proscribed. Grant does not claim his conviction for assault or menacing threats is unconstitutional; hence, we need not consider it in any constitutional analysis.

[9,10] The 1st Amendment to the U.S. Constitution, applicable to the states via the 14th Amendment,[10] provides in relevant part that "Congress shall make no law . . . abridging the freedom of speech . . . ." Similarly, under the Nebraska Constitution, "[e]very person may freely speak . . . on all subjects . . . ."[11] We have recognized that the "'parameters of the constitutional right to freedom of speech are the same under

---

[6] See *id.*

[7] See, *Carney v. Miller*, 287 Neb. 400, 842 N.W.2d 782 (2014); *State v. Drahota*, 280 Neb. 627, 788 N.W.2d 796 (2010).

[8] See *State v. Greer*, 309 Neb. 667, 962 N.W.2d 217 (2021).

[9] *Id.*

[10] *NIFLA v. Becerra*, ___ U.S. ___, 138 S. Ct. 2361, 201 L. Ed. 2d 835 (2018).

[11] Neb. Const. art. I, § 5.

both the federal and the state Constitutions.'"[12] Both mean that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.[13] And so, in effect, both limit the State's ability to prosecute certain criminal offenses when such prosecution entails content control involving protected speech.[14]

### (a) Proscribable Speech

[11-14] The broad protections afforded by the federal and state Constitutions, however, are not absolute.[15] The general rule against government control over the content of speech does not apply to certain well-defined and narrowly limited categories of expression.[16] These speech categories are unprotected.[17] They are thought to form "no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."[18] Categories of content that can be proscribed include libel, obscenity, incitements to imminent lawlessness, true threats, and fighting words.[19] The State asserts

---

[12] *State ex rel. Bruning v. Gale*, 284 Neb. 257, 272, 817 N.W.2d 768, 779 (2012) (quoting *State ex rel. Lemon v. Gale*, 272 Neb. 295, 721 N.W.2d 347 (2006)).

[13] See, *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 122 S. Ct. 1700, 152 L. Ed. 2d 771 (2002). Accord, *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S. Ct. 2875, 77 L. Ed. 2d 469 (1983); *Police Department of Chicago v. Mosley*, 408 U.S. 92, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972). Cf. *State ex rel. Bruning v. Gale, supra* note 12.

[14] See, *NIFLA v. Becerra, supra* note 10; *State v. Drahota, supra* note 7.

[15] See, *Virginia v. Black*, 538 U.S. 343, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003); *State v. Drahota, supra* note 7.

[16] See *Virginia v. Black, supra* note 15.

[17] See *State v. Drahota, supra* note 7.

[18] *Id.* at 633, 788 N.W.2d at 801 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S. Ct. 766, 86 L. Ed. 1031 (1942)) (internal quotation marks omitted).

[19] *State v. Drahota, supra* note 7.

that Grant's conviction should be upheld because the speech underlying his convictions were proscribable "threats and fighting words."[20] For our analysis we assume, without deciding, that Grant's speech was not proscribable under any of the enumerated categories and is protected by the federal and state Constitutions.

[15] However, it does not follow that speech which is not proscribable by one of these enumerated categories cannot be restricted. As will be discussed in further detail below, the government may restrict protected speech through reasonable restrictions on the time, place, and manner of speech, and even a content-based restriction can be upheld if it satisfies the requisite standard of scrutiny.[21]

Neither the parties nor the county or district courts specifically addressed time, place, and manner restrictions or the levels of scrutiny for constitutional challenges. Accordingly, this court entered an order directing the parties to submit supplemental briefs, with any new content limited to the applicability of time, place, and manner restrictions in this case.

[16] We have held that "where the record adequately demonstrates that the decision of a trial court is correct, although such correctness is based on a ground or reason different from that assigned by the trial court, an appellate court will affirm."[22] Thus, even where the county and district courts may have decided this issue based on the content of Grant's speech, we are able to affirm his conviction if we find that his speech can be restricted by the State for reasons other than content.

(b) Restrictions of Time, Place, and Manner

[17] As a preliminary matter, in order to bring a claim for violation of the federal or state constitutional guarantees of

---

[20] Brief for appellee at 7.

[21] See *Reed v. Town of Gilbert*, 576 U.S. 155, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015).

[22] *Jessen v. Malhotra*, 266 Neb. 393, 396, 665 N.W.2d 586, 590 (2003) (citing *Egan v. Stoler*, 265 Neb. 1, 653 N.W.2d 855 (2002)).

free speech, the alleged violation must involve state action.[23] The free speech provisions of the federal and state Constitutions were not intended to guard against private interference or restrain private conduct.[24] Because Grant's convictions arise under an ordinance contained in the Lincoln Municipal Code, it is clear that his speech is being regulated by the government and that there is state action.

[18] Our next step is to analyze whether the regulation restricts speech based on its content. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.[25] Conversely, government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.[26] For example, a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation.[27]

[19,20] Our analysis regarding the content of the ordinance would generally begin with the language of the ordinance that Grant was convicted of violating.[28] But where, as here, the defendant has failed to include the ordinance at issue in the record, we may not consider that ordinance's text.[29] We may instead apply the ordinance's text as reproduced in the State's long-form complaint.[30] Absent anything to the contrary, we give that language its plain and ordinary meaning.[31]

---

[23] See *Dossett v. First State Bank*, 261 Neb. 959, 627 N.W.2d 131 (2001).

[24] See *id.*

[25] *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989).

[26] *Reed v. Town of Gilbert, supra* note 21.

[27] *Id.*

[28] See *In re Interest of Elainna R.*, 298 Neb. 436, 904 N.W.2d 689 (2017).

[29] See *State v. Buescher*, 240 Neb. 908, 485 N.W.2d 192 (1992).

[30] See *State v. Hill*, 254 Neb. 460, 577 N.W.2d 259 (1998).

[31] Cf. *In re Interest of Elainna R., supra* note 28.

According to the State's complaint, "Count 1" defined Grant's offense of "disturbing the peace" as "Intentionally or knowingly disturb the peace and quiet of any person, family, or neighborhood."

The prohibition against disturbing the peace, as described by the State in its charging document, makes no reference to the content of speech and does not target particular speech on its face due to the content discussed or the viewpoint expressed. Instead, the rule is content neutral.

We recognize that the State elicited and relied on evidence of the content of Grant's speech at trial. Such evidence was unnecessary, however, to establish a violation under the language of the disturbing the peace charge in the complaint (i.e., "[i]ntentionally or knowingly disturb the peace and quiet of any person, family, or neighborhood . . ."). We also note that Grant registered no contemporaneous objection to the admission of evidence regarding the content of his speech.

[21] Where a law is content neutral on its face, the court must then determine the forum in which the speech takes place, as the government's ability to regulate the time, place, and manner of speech varies according to the type of forum.[32]

[22-25] Speech may take place in a traditional public forum, in a designated public forum, in a nonpublic forum, or on private property.[33] Traditional public forums are those places which are owned by the government and historically "'have been devoted to assembly and debate,'"[34] "'communicating thoughts between citizens, and discussing public questions.'"[35] Public streets, sidewalks, and parks fall into this category, including streets and sidewalks which run through residential

---

[32] See *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983).

[33] See *Cornelius v. NAACP Legal Defense & Ed. Fund*, 473 U.S. 788, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985).

[34] See *id.*, 473 U.S. at 802.

[35] *Perry Ed. Assn. v. Perry Local Educators' Assn., supra* note 32, 460 U.S. at 45.

neighborhoods.[36] Designated public forums, on the other hand, are those that have not been historically associated with expression but which the government has opened for such use, such as civic auditoriums or public theaters.[37] Nonpublic forums include government-owned property that is not a traditional or designated public forum, such as government offices and military bases.[38] Private property is property which is "protected from public appropriation[,] over which the owner has exclusive and absolute rights."[39]

[26,27] Grant contends that the government may not restrict his speech because it occurred on his private property. However, Grant's speech became an issue not merely when he spoke from his own balcony, but because his speech could be heard on, and intruded into, the private property of others. The police power of a state extends beyond health, morals, and safety, and comprehends the duty, within constitutional limitations, to protect the well-being and tranquility of a community, including the power to prevent disturbing noises.[40] The U.S. Supreme Court has repeatedly held that the "'right to be let alone'" is one of the rights "'most valued by civilized [society]'" and that the "right to avoid unwelcome speech has special force in the privacy of the home . . . and its immediate surroundings."[41] Grant's speech occurred not only on his own property, but was also broadcast at least "50 yards," across public streets and sidewalks, and onto the private property of others. Here, it is most appropriate to analyze Grant's speech as that occurring in a public forum.

---

[36] *Frisby v. Schultz*, 487 U.S. 474, 108 S. Ct. 2495, 101 L. Ed. 2d 420 (1988).

[37] See *Cornelius v. NAACP Legal Defense & Ed. Fund, supra* note 33.

[38] See *Perry Ed. Assn. v. Perry Local Educators' Assn., supra* note 32.

[39] Black's Law Dictionary 1472 (11th ed. 2019).

[40] See *Kovacs v. Cooper*, 336 U.S. 77, 69 S. Ct. 448, 93 L. Ed. 513 (1949).

[41] *Hill v. Colorado*, 530 U.S. 703, 716, 717, 120 S. Ct. 2480, 147 L. Ed. 2d 597 (2000).

[28] In either a traditional or designated public forum, the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions (1) are content neutral as to both subject matter and viewpoint, (2) are narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternative channels for communication of the information.[42] As explained above, the ordinance does not aim to restrict speech or other behavior based on content or viewpoint, and can be justified absent any reference to content of speech. Thus, the first element of this time, place, and manner test is satisfied.

### (i) Narrowly Tailored to Significant
### Governmental Interest

[29] The second element of the time, place, and manner test, the narrow tailoring requirement, is satisfied so long as the ordinance promotes a substantial government interest that would be achieved less effectively absent the regulation, such as deterring conduct inimical to public health, decency, and order, or the tranquility of the neighborhood.[43] Ponce testified at trial that the homeowner whose residence she was painting had described Grant's commentary as "not an uncommon thing" and that Ponce herself was "'fine'" with these comments at first as she continued to work. Ponce only called the police after Grant's commentary continued for such a long period of time that her work was disrupted.

Patterson also testified that Grant had been making similar comments "every day [Ponce] was there" painting the house and that Grant's comments "[weren't anything] new. He'd always sit on the porch and holler racial slurs, all the time, towards [Patterson], towards the neighbors, [and] even towards people walking down the street." The ordinance, and

---

[42] See, e.g., *Ward v. Rock Against Racism, supra* note 25; *City of Lincoln v. ABC Books, Inc.*, 238 Neb. 378, 470 N.W.2d 760 (1991).

[43] See *City of Lincoln v. ABC Books, Inc., supra* note 42.

its restrictions on Grant's speech toward Ponce and Patterson, only came into play on this date because Grant's commentary had been very loud and because it had carried on for such a long period of time that it disrupted others in the area. Based on these facts, it is clear that the city's interest in deterring not only unlawful conduct, but conduct inimical to public decency and order, would not be achieved as effectively without this ordinance; and we have previously held that this is sufficient to satisfy the second element of the time, place, and manner test.[44]

### (ii) Ample Alternative Channels of Communication

The third element of the time, place, and manner test requires that the ordinance leave open ample alternative channels of communication for the speech that it restricts. We find no evidence in the record indicating that Grant was restricted from making this speech in all forms, but specifically that he could not continue "yelling." Ponce testified that "after [the police] left, [Grant] continued to yell things." Ponce was "not sure exactly what [Grant] was yelling," but she called the police a second time because Grant "was on the phone, yelling at somebody, and then he hung up and he was yelling." This yelling was continuing to disturb both Ponce and the homeowner of the residence she was painting.

[30] Based on the testimony offered at trial, it appears that Grant would have been free to communicate the same content in a number of different forms as long as it was communicated in a quieter manner. This limitation as to Grant's volume level is similar to the facts in *Ward v. Rock Against Racism*,[45] where an ordinance restricting the volume of music was found to have "no effect on the quantity or content of that expression beyond regulating the extent of amplification." If Grant had

---

[44] See *id.*

[45] *Ward v. Rock Against Racism, supra* note 25, 491 U.S. at 802.

been communicating this same content without yelling loudly down the street, for a lengthy period of time, we find no evidence in the record that he would have been cited under this ordinance. Thus, the ordinance itself leaves open ample alternative channels of communication and satisfies the third prong of the time, place, and manner test.

We find all elements of the time, place, and manner test are satisfied, such that this ordinance as applied to Grant did not violate his right to free speech under the federal and state Constitutions. Accordingly, we affirm his conviction for disturbing the peace.

## 2. CONVICTION FOR ASSAULT OR MENACING THREATS

Having determined that Grant's conviction for disturbing the peace must be affirmed, we next consider his conviction for assault or menacing threats. Grant does not challenge the constitutionality of this conviction, but, rather, he assigns that there was insufficient evidence to support this conviction. We disagree.

[31] When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[46]

Our analysis would generally begin with the language of the ordinance that Grant was convicted of violating.[47] But, again, the defendant has failed to include the ordinance at issue in the record, so we may not consider that ordinance's text.[48] We must instead apply the ordinance's text as reproduced in the

---

[46] See *State v. Estrada Comacho, supra* note 4.

[47] See *In re Interest of Elainna R., supra* note 28.

[48] See *State v. Buescher, supra* note 29.

State's long-form complaint.[49] Absent anything to the contrary, we give that language its plain and ordinary meaning.[50]

According to the State's complaint, "Count 2" defined Grant's offense of assault or menacing threats in this way:

Intentionally or knowingly threaten another in a menacing manner, attempt to strike her, or place him or her in fear or apprehension of imminent bodily harm, or intentionally, knowingly, or recklessly strike or cause bodily injury to her, to wit: Jennifer Sue Ponce; in violation of Lincoln Municipal Code Section 9.12.010.

(M $200-$500 fine, max 6 months jail - L.M.C. Section 9.20.100)[.]

This court has previously examined the meaning of the words "assault," "threaten," and "menacing":

A criminal "assault" includes the intentional doing of an act which places another person in reasonable apprehension of receiving bodily injury. To "threaten" is commonly understood to mean promising punishment, reprisal, or distress. The meaning of "menacing" includes the showing of an intention to do harm.[51]

These three terms have typically been reviewed in conjunction with one another in order to better define what constitutes a threat for purposes of third degree assault. According to statute, a person commits the offense of assault in the third degree if he or she intentionally, knowingly, or recklessly causes bodily injury to another person or threatens another in a menacing manner.[52]

Where § 28-310(1)(b) requires application of all three of the above terms, we held that § 28-310(1)(b) "'renders unlawful a promise to do another person bodily harm which is made in

---

[49] See *State v. Hill, supra* note 30.

[50] Cf. *In re Interest of Elainna R., supra* note 28.

[51] *State v. Kunath*, 248 Neb. 1010, 1014, 540 N.W.2d 587, 591 (1995). Accord *In re Interest of Siebert*, 223 Neb. 454, 390 N.W.2d 522 (1986).

[52] Neb. Rev. Stat. § 28-310(1)(b) (Reissue 2016).

such a manner as to intentionally cause a reasonable person in the position of the one threatened to suffer apprehension of being so harmed.'"[53] Thus, this statute is violated when a person acts "'in such a manner as to intentionally cause a reasonable person in the position of the one threatened to feel apprehension of being [bodily] harmed.'"[54] A fear of bodily harm or injury must be shown because all three terms, "assault," "threaten," and "menacing," are applicable.

However, the complaint in this case specified that Grant was charged with assault *or* menacing threats. The charging language does not mirror the language set forth by § 28-310(1)(b), and thus, our analysis does not require application of all three terms in conjunction with one another. In contrast to § 28-310, where a defendant can commit assault by making menacing threats, the language of this complaint indicates that the term "assault" versus the term "menacing threats" can be analyzed as separate from one another. The charging language also supports this view, where it lays out alternative elements of proof: "[i]ntentionally or knowingly threaten another in a menacing manner" versus intentionally or knowingly "place him or her in fear or apprehension of imminent bodily harm."

[32] Under this scheme, "[t]hreat[s] . . . in a menacing manner" is separated from those elements that have traditionally constituted the crime of assault. Thus, we are able to isolate the terms "threaten" and "menacing." These two terms, as isolated, simply mean that the State must prove Grant has promised punishment, reprisal, or distress and that he had an intention to do harm. Unlike our analysis regarding § 28-310(1)(b), the language of this complaint "'renders unlawful a promise to do another person bodily harm,'"[55] but does not require that the promise to do harm be made in any particular manner and

---

[53] *State v. Kunath, supra* note 51, 248 Neb. at 1014, 540 N.W.2d at 591 (quoting *In re Interest of Siebert, supra* note 51).

[54] See *id.*

[55] See *id.*

does not require an analysis of whether a reasonable person would feel threatened. That the speaker intended to do harm means the speaker must have intended, at a minimum, to cause distress to the recipient of the threatening words.

In reviewing the evidence admitted at trial, viewed and construed most favorably to the State, we find that Grant did threaten Ponce in a menacing manner. Grant told Ponce he would "'put bullets in your boyfriend[],'" a promise of punishment, reprisal, or distress. The evidence adduced at trial also indicates that Grant made these comments to Ponce in order to cause her some form of mental distress: his commentary was provocative and explicit and became increasingly violent and specific as the day progressed. It is clear that Grant was trying to disrupt Ponce in her work and that he was trying to agitate her. And he succeeded, where Ponce testified that Grant's continued commentary did cause her anxiety. Grant offered no alternative explanation.

Accordingly, the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the elements of assault or menacing threats beyond a reasonable doubt, and thus, we affirm Grant's conviction.

## 3. Excessive Sentences Argument

Having affirmed Grant's convictions, we turn last to his claim that his sentences were excessive.

[33] The first step in analyzing whether a sentence is excessive is to examine the statutory limits on penalties for such offenses.[56] But because Grant failed to include the ordinances at issue in the appellate record, they may not be consulted on appellate review and the information contained in the complaint must suffice.[57] According to the complaint, the maximum penalties listed for disturbing the peace are a "$500 fine" and "3 months jail." The maximum penalties listed for assault

---

[56] *State v. Starks*, 308 Neb. 527, 955 N.W.2d 313 (2021).

[57] See *State v. Hill, supra* note 30.

or menacing threats are a "$200-$500 fine" and "6 months jail." Plainly, Grant's sentence of 10 days in jail does not exceed these limits. Thus, if the sentence imposed is within statutory limits, the second step is to review for an abuse of discretion.[58]

[34-36] In reviewing whether an abuse of discretion occurred during sentencing, an appellate court determines whether the sentencing court considered and applied the well-established factors and any applicable legal principles in determining the sentence to be imposed.[59] When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.[60] The sentencing court is not limited to any mathematically applied set of factors, but the appropriateness of the sentence is necessarily a subjective judgment that includes the sentencing judge's observations of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.[61]

Grant contends that his sentences were an abuse of discretion because in imposing the sentences, the county court "ignored" several important factors, including Grant's request for only a fine or probation, his weekly attendance at church groups, his volunteerism at a homeless shelter, and his more than 20 years "without being convicted of a similar offense."[62]

At the sentencing hearing, Grant's attorney offered much of this same evidence into the record. In determining Grant's sentence, the county court considered that evidence, the

---

[58] See *State v. Starks, supra* note 56.

[59] See *State v. Greer, supra* note 8.

[60] See *id.*

[61] *Id.*

[62] Brief for appellant at 25.

State's evidence, and Grant's presentence investigation report. According to Grant's presentence investigation report, Grant was 50 years old at the time of sentencing and had a criminal history dating back to his youth, including convictions in 1996 for third degree assault and in 1987 for attempted burglary. Grant also had recent minor traffic offenses. He had dropped out of high school during the 11th grade, and then for about 2 years, he had been part of a criminal gang. Throughout his life, Grant had struggled to maintain steady employment and was currently unemployed. He reported maintaining few healthy relationships throughout his adulthood.

After reviewing this evidence, the county court ordered 10 days in jail for each conviction, to run concurrently, noting that "any less sentence this Court would impose would depreciate the seriousness of the offense and promote disrespect for the law." Despite Grant's emphasis on his positive achievements, the record provides a sound basis for the sentences imposed. Accordingly, Grant's convictions and resulting sentences were not in error.

## V. CONCLUSION

For the reasons explained above, we affirm Grant's convictions for disturbing the peace and for assault or menacing threats and find that the resulting sentences were not an abuse of discretion.

Affirmed.