IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. CLIFTON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

CASEY B. CLIFTON, APPELLANT.

Filed August 16, 2022.    No. A-21-306.

Appeal from the District Court for Cass County: MICHAEL A. SMITH, Judge. Affirmed.

Jeffery W. Davis and Gregory D. Kratz, of Smith, Schafer, Davis, L.L.C., for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

MOORE, RIEDMANN, and WELCH, Judges.

RIEDMANN, Judge.

## INTRODUCTION

Casey B. Clifton was convicted in the district court for Cass County of first degree sexual assault and incest. On appeal, he challenges the sufficiency of the evidence to sustain his convictions, the State's successful motion in limine, the overruling of his objection to a jury instruction, and the sentences the court imposed. Finding that the district court did not err in these regards, we affirm Clifton's convictions and sentences.

## BACKGROUND

In August 2019, the State filed an initial information against Clifton, and it later amended the information to charge him with first degree sexual assault, incest, and third degree sexual assault of a child. The matter proceeded to a jury trial, at which the evidence established that Clifton, born in 1982, was the stepfather of K.R. born in 2002.

- 1 -

At trial, K.R. testified that she began to go through puberty in fifth or sixth grade. When she was in eighth grade, Clifton began showing an interest in her breasts, and he would comment on them, compliment them, and check them for lumps, both on top and underneath her clothing. She described her relationship with Clifton, detailing that around the time she was 16 years old, he would give her beer and wine, shower with her while they were both naked and make her demonstrate how she shaved her pubic area, kiss her with an open mouth, and show and talk about his genital area. He would also make her go in the family hot tub with him, and while there, Clifton would talk about sexual things, grab her thigh, make her straddle his lap, and kiss her. At night, he would come into her bedroom while she was sleeping and lay next to her, touch her, and grope her breasts and buttocks.

K.R. described two specific incidents that led to the criminal charges. The first occurred in February 2019, during a gathering her family held at their home. While she was using the bathroom, Clifton knocked on the door, and although she asked him to wait, he unlocked the door and walked in. He walked over to her, and when she stood up to wipe with toilet paper, Clifton used his finger to touch her "right below her clitoris," not on the clitoris itself but just below it, "like where you pee." She had not asked him to touch her or consented to him touching her, and he did not ask her permission to touch her. K.R. was asked, "When he touched you down there on the part where you pee, right below your clitoris, did his index finger or any part of his index finger or even a small portion of his index finger go past or enter your labia?" She replied, "Yes, without a doubt."

K.R. detailed a second incident that occurred in April 2019. While she and Clifton were in the hot tub together, he gave her a beer and began talking about the time in February when he had seen her vagina, referring to it as "cute." Clifton made K.R. show her genital area to him again. When they got out of the hot tub and K.R. went to get in the shower, Clifton followed her and got into the shower with her, naked, and kissed her. She got out of the shower and started drying off with a towel. He then picked her up, set her on the counter, and started rubbing her clitoris with his finger. While doing so, he repeatedly asked her if she "liked it," and she testified that she "was telling him no and asking him to stop." He continued making sexual comments to her, asking her if she wanted him to put his fingers in her vagina or put his tongue "down there." K.R. testified, "And I said, 'no; please stop.'" He then asked if he could "just do it for . . . 20 more seconds," and when she said "no" again, he finally stopped.

K.R. then got down from the counter and went into her bedroom. Clifton followed her into her bedroom where he watched her get dressed and made comments about her body and her underwear. After she got dressed and lay down in her bed, Clifton continued making sexual comments to her, asking if he could touch her again, if she would touch herself, and if she had any sex toys. K.R. testified that she kept saying no to him and that finally she "got very firm with him" and said, "'No, I'm not doing that; you're not doing that; you need to stop.'"

K.R. confirmed that she did not invite Clifton to touch her or consent to him touching her and that she told him to stop more than one time. She was asked whether, when he touched her while she was sitting on the counter, his finger went past or entered her labia, and she replied, "Yes, I know that that did happen."

Dr. Stacie Bleicher, a board certified pediatrician working at a child advocacy center, also testified at trial. She described the anatomical structure of the female genitalia, including that the

skin folds of the labia extend around the urethra and up and around the clitoris. She explained that, therefore, in an anatomical sense, rubbing the clitoris or touching the urethral opening of a 16-year-old girl would constitute an intrusion into the genital opening of the girl's body.

A recording of a phone call that K.R. made to Clifton in May 2019 was admitted into evidence and played for the jury at trial. During the conversation, K.R. told Clifton that she was upset about the things that had been going on between them, like "the showering," and he acknowledged that. She said she knew it was wrong, "like when you rubbed my 'clit,'" and he replied, "Yeah." She stated, "I don't know why you did that," and he responded, "And the whole thing is like the two of us don't need to be drinking in the hot tub." He then commented that it was "not sexual, I mean it is sexual but it's not like I was aiming to have sex with you." He clarified, "I wasn't rubbing you to like . . . I don't know, honey, to tell you the truth." Then she reminded him, "But you kept saying 'does it feel good,'" and he replied, "Yes, I know and I shouldn't have, like I said I had 6 beers in 1 hour and I don't need to do that with you." At one point he acknowledged, "I shouldn't have touched you there" and repeatedly assured her that it would never happen again. He also warned her that "if this goes out, I'm going to the penitentiary." He continued that he would also have to get a divorce from her mother and leave his children "over something that was dumb."

Clifton testified in his own defense at trial, and his version of events differed from those K.R. described. According to Clifton, while K.R. was growing up, she would go to him with all of her questions and confide in him about life, sex, and boys. He denied ever fondling her breasts or buttocks and denied ever showering with her.

He testified that during K.R.'s sophomore year of high school, she approached him because she was uncomfortable with her genitalia, claiming that she has something she called a "pee-er" that "hangs out of her vagina" approximately one-half inch. He disagreed that the February 2019 incident occurred the way that K.R. described. Instead, he testified that the bathroom door was open while K.R. was using the bathroom and that when he walked in, she was standing and complaining about her "pee-er," and he told her that it was "cute" but denied touching her.

With respect to the April 2019 incident, Clifton testified that he and K.R. were in the hot tub together when she complained that a friend was "picking on her" about her "pee-er." According to Clifton, when they got out of the hot tub, K.R. asked him, "Will you show me what I have going on?" and he agreed, so she sat up on the counter, and he "poked" her "pee-er" and told her to take care of herself and not worry about what anyone thinks of her vagina at age 16. He denied following her into her bedroom or making sexual comments to her and claimed that he simply went upstairs and the incident ended.

At trial, Clifton acknowledged that in the recorded call, K.R. asked him about rubbing her clitoris. He claimed, however, that during the call, he thought she said "rubbing it" rather than "rubbing my 'clit'" and that he acknowledged doing so because he had "rubbed her 'pee-er.'"

The jury found Clifton guilty of first degree sexual assault and incest. The court sentenced him to 15 to 20 years' imprisonment for sexual assault and to a consecutive term of 10 to 15 years' imprisonment for incest. Clifton timely appeals.

ASSIGNMENTS OF ERROR

Clifton assigns that the district court erred in (1) confirming the jury's verdict when it was not supported by sufficient evidence, (2) granting the State's motion in limine precluding him from adducing evidence of K.R.'s sexual orientation or mental health status, (3) allowing a jury instruction containing a definition of sexual penetration that was biased and prejudicial, and (4) imposing excessive sentences.

STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Smith*, 302 Neb. 154, 922 N.W.2d 444 (2019).

Whether jury instructions given by a trial court are correct is a question of law. *State v. Fischer*, 272 Neb. 963, 726 N.W.2d 176 (2007). When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below. *Id*. In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Id*.

Absent an abuse of discretion by the trial court, an appellate court will not disturb a sentence imposed within the statutory limits. *State v. Grant*, 310 Neb. 700, 968 N.W.2d 837 (2022). A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *Id*.

ANALYSIS

*Sufficiency of Evidence.*

Clifton assigns that the evidence presented at trial was insufficient to sustain the convictions. He focuses his argument on whether there was sufficient evidence for the jury to find the occurrence of sexual penetration. He also challenges whether the State sufficiently proved a lack of consent. We find the evidence sufficient to sustain the convictions.

The jury convicted Clifton of first degree sexual assault and incest. Any person who subjects another person to sexual penetration without the consent of the victim is guilty of sexual assault in the first degree. Neb. Rev. Stat. § 28-319(1)(a) (Reissue 2016). Any person who engages in sexual penetration with his or her stepchild who is under the age of 19 years of age commits incest. Neb. Rev. Stat. § 28-703(1) (Reissue 2016).

The relevant definition of sexual penetration includes any intrusion, however slight, of any part of the victim's body which can be reasonably construed as being for nonmedical, nonhealth, or nonlaw enforcement purposes. Neb. Rev. Stat. § 28-318(6) (Cum. Supp. 2020). See also § 28-703(3)(a). The slightest intrusion into the genital opening is sufficient to constitute

penetration, and such element may be proved by either direct or circumstantial evidence. *State v. Smith*, 302 Neb. 154, 922 N.W.2d 444 (2019). It is not necessary that the vagina be entered or that the hymen be ruptured; the entry of the vulva or labia is sufficient. *Id*. In *State v. Smith, supra*, the Nebraska Supreme Court found the evidence sufficient to prove sexual penetration based on testimony that the defendant touched the victim "'between the skin folds known as the labia'" and "'between the lips of her vagina.'" *Id*. at 183, 922 N.W.2d at 465.

Clifton's argument related to sexual penetration is twofold. First, he claims that no penetration occurred because he solely touched K.R.'s "pee-er," which protruded outside of her genitalia and required no intrusion into her body. In addition, he asserts that the State failed to prove that any penetration was for a nonmedical or nonhealth purpose, claiming that he "poked" K.R.'s "vaginal protrusion" as a concerned parent interested in her health and well-being. These arguments rely on the jury believing his version of events, however. Although Clifton contended that K.R. asked him to examine her genitalia, including her "pee-er," because it was causing her stress and embarrassment, K.R. testified that Clifton rubbed her clitoris and made sexual comments to her. The jury elected to find K.R.'s version of events more credible, and we do not reweigh that decision on appeal.

According to K.R., in February 2019, Clifton touched her "right below her clitoris" on her urethra with his finger. She was specifically asked whether his finger went past or entered her labia, and she replied, "Yes, without a doubt." As for the incident that occurred in April, K.R. explained that Clifton sat her on the bathroom counter and rubbed her clitoris. When asked whether his finger went past or entered her labia, she responded, "Yes, I know that that did happen." And in the recorded phone call, Clifton did not deny rubbing K.R.'s clitoris and confirmed that he asked her at that time whether it felt good.

K.R. acknowledged that when she was initially interviewed by law enforcement, she denied that any penetration had occurred. She clarified, however, that at that time she believed penetration required the penis entering the vagina. At trial, she unequivocally testified that Clifton "put his finger on my clitoris." Then she added, "And my urethra." According to Bleicher, touching the clitoris or urethral opening of a 16 year old girl constitutes penetration in an anatomical sense. The evidence was therefore sufficient for a rational jury to find the slightest intrusion into K.R.'s genital opening for a nonmedical or nonhealth purpose.

In addition, Clifton asserts that the State failed to prove that penetration occurred without consent. Without consent means: (a)(i) The victim was compelled to submit due to the use of force or threat of force or coercion, or (ii) the victim expressed a lack of consent through words, or (iii) the victim expressed a lack of consent through conduct, or (iv) the consent, if any was actually given, was the result of the actor's deception as to the identity of the actor or the nature or purpose of the act on the part of the actor. § 28-318(8).

With respect to the April 2019 incident, K.R. testified that while she was on the counter and Clifton was rubbing her clitoris, he asked her if she liked what he was doing, and she told him no and asked him to stop. He continued to make sexual comments to her and asked if she wanted him to put his fingers in her vagina or put his tongue "down there," and she replied "no" and continued asking him to stop. She confirmed at trial that she told Clifton to stop more than once. This evidence establishes that K.R. expressed a lack of consent through words and was therefore sufficient for the jury to have found that Clifton subjected K.R. to sexual penetration without

consent. As such, we find that the district court did not err in finding the evidence sufficient to sustain the convictions.

*Motion in Limine.*

Although Clifton assigns that the district court erred in granting the State's motion in limine precluding him from adducing evidence related to K.R.'s sexual orientation or mental health, the argument in his brief relates only to evidence of K.R.'s mental health. We therefore limit our discussion accordingly.

A motion in limine is but a procedural step to prevent prejudicial evidence from reaching the jury. *State v. Schmidt*, 16 Neb. App. 741, 750 N.W.2d 390 (2008). It is not the office of such a motion to obtain a final ruling upon the ultimate admissibility of the evidence. *Id*. Rather, its office is to prevent the proponent of potentially prejudicial matter from displaying it to the jury, making statements about it before the jury, or presenting the matter to the jury in any manner until the trial court has ruled upon its admissibility in the context of the trial itself. *Id*. In order to preserve any error before an appellate court, the party opposing a motion in limine which was granted must make an offer of proof outside the presence of the jury unless the evidence is apparent from the context within which questions were asked. *Id*.

In the present case, Clifton asserts that evidence of K.R.'s mental health condition at the time of the pertinent events was relevant because it would tend to show his care and compassion toward her, and he argues that the court's refusal to allow him to question K.R. about this topic deprived him of his constitutional right to confront his accuser. At the hearing on the State's motion in limine, however, Clifton argued that if the State adduced evidence at trial from which the jury could infer that K.R.'s mental health struggles were the result of having been sexually assaulted by Clifton, he wanted to be allowed to rebut that inference by showing that there were other reasons that she was struggling.

Regardless of the basis for his argument, at trial, Clifton did not attempt to question K.R. about mental health or counseling, ask the court to allow him to raise the issue, or make an offer of proof as to what evidence he wanted to adduce related to K.R.'s mental health. The district court, therefore, was not presented with the opportunity to address this issue or to make a final ruling on the eligibility of such evidence. Accordingly, the court's pretrial preliminary ruling on the motion in limine did not preserve error for this court to review, and we decline to address it.

*Jury Instruction.*

Clifton argues that the district court erred in overruling his objection to the jury instruction defining sexual penetration. He claims that the instruction given deviated from the pattern jury instruction by adding language that was superfluous and confusing. Although the Nebraska pattern jury instructions are to be used whenever applicable, a failure to follow the pattern jury instructions does not automatically require reversal. *State v. Young*, 279 Neb. 602, 780 N.W.2d 28 (2010). We find no reversible error in the instruction given.

Before an error in the giving of instructions can be considered as a ground for reversal of a conviction, it must be considered prejudicial to the rights of the defendant. *State v. Fischer*, 272 Neb. 963, 726 N.W.2d 176 (2007). Jury instructions must be read as a whole, and if they fairly present the law so that the jury could not be misled, there is no prejudicial error. *Id*.

The instruction to which Clifton objected stated:

"Sexual Penetration" is any intrusion, however slight, into the genital opening of a victim by any part of the defendant's body. The slightest intrusion into the genital opening is sufficient to constitute penetration, and such element can be proved by either direct or circumstantial evidence. It is not necessary that the vagina be entered or that the hymen be ruptured, the entry of the vulva or labia is sufficient.

The first sentence of the given instruction mirrors the pattern jury instruction provided in NJI2d Crim. 4.6, and Clifton takes no issue with that portion of it. He does, however, object to the final two sentences. He claims that they were unnecessary and could have confused the jury.

The added language was taken directly from Nebraska case law. See, e.g., *State v. Smith*, 302 Neb. 154, 922 N.W.2d 444 (2019). It provides a more detailed definition of sexual penetration and comports with the evidence adduced at trial, where K.R. alleged entry of solely the labia. We do not find that it would mislead the jury or prejudice Clifton.

Clifton also notes that the given instruction advises the jury that it may find sexual penetration based on direct or circumstantial evidence, and because a separate jury instruction generally advised that the jury could rely on direct or circumstantial evidence, he argues that the jury may believe that allowing a fact to be proved by circumstantial evidence was somehow more important when it comes to sexual penetration. We reject this argument. The separate jury instruction defined the two kinds of evidence, detailing that direct evidence is either physical evidence of a fact or testimony by someone who has first-hand knowledge of a fact by means of his senses whereas circumstantial evidence is evidence of a fact from which another fact logically can be inferred. Even if the duplicate reference to direct and circumstantial evidence served to highlight that issue for the jury, as Clifton claims, evidence of sexual penetration was proved mainly by direct evidence by way of K.R.'s first-hand knowledge, and not solely by circumstantial evidence. Based on the foregoing, we find that the district court did not err in overruling Clifton's objection to the jury instruction defining sexual penetration.

*Excessive Sentence.*

Finally, Clifton assigns that the district court abused its discretion in imposing excessive sentences. He does not allege that the sentences fall outside the statutory limits; rather, he argues that the court failed to properly consider certain mitigating factors and that it erroneously found that he would be a substantial risk to reoffend if placed on probation. He also contends that the charges of which he was convicted were essentially a single crime, and that therefore, the court should have ordered his sentences to run concurrently. We find no abuse of discretion in the sentences imposed.

First degree sexual assault is a Class II felony, punishable by 1 to 50 years' imprisonment. § 28-319; Neb. Rev. Stat. § 28-105 (Cum. Supp. 2020). Incest of a victim under 18 years old is a Class IIA felony, which carries a maximum term of imprisonment of 20 years. §§ 28-703 and 28-105.

Generally, a trial court has discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively even when offenses carry a mandatory minimum sentence, unless the statute requires consecutive sentences. See *State v. Stone*, 298 Neb. 53, 902

N.W.2d 197 (2017). Accordingly, Clifton's sentences come within the statutory limits, and the district court acted within its discretion in ordering the sentences to run consecutive to one another.

In reviewing whether an abuse of discretion occurred during sentencing, an appellate court determines whether the sentencing court considered and applied the well-established factors and any applicable legal principles in determining the sentence to be imposed. *State v. Grant*, 310 Neb. 700, 968 N.W.2d 837 (2022). When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *Id*. The sentencing court is not limited to any mathematically applied set of factors, but the appropriateness of the sentence is necessarily a subjective judgment that includes the sentencing judge's observations of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

Clifton argues that the district court abused its discretion by finding that there was a substantial risk that he would reoffend during a period of probation. He also claims that the record reveals several factors weighing in favor of a lower sentence, including his criminal history, education, and employment.

We first disagree that the record does not support the court's conclusion that the risk was substantial that during probation he would commit additional crimes. Pursuant to testing conducted for purposes of the presentence investigation report (PSR), Clifton scored in the medium-high risk range for reoffense and as a moderate risk to sexually reoffend. Moreover, he was initially placed on pretrial release in 2019, but his bond was revoked in November 2020 due to an incident involving a Cass County court staff member. Thus, given the revocation of pretrial release, his score as a medium-high risk to reoffend, and the seriousness of the offenses, the probation officer who completed the PSR did not believe that Clifton was a suitable candidate for probation and had concerns about his compliance with ongoing supervision. Based on the foregoing, the district court's opinion that there was a substantial risk that Clifton would commit additional crimes if placed on probation was not an abuse of the court's discretion.

In addition, after reviewing the record, we recognize that there are mitigating factors present, but we disagree that the sentences imposed were an abuse of the district court's discretion. Clifton was 39 years old at the time of sentencing. His criminal history was minimal with no prior felony offenses or violent crimes. He and K.R.'s mother were married in 2008, had two children together, and separated in May 2019, with their divorce becoming final in November 2020. He also has an older daughter as a result of a previous relationship. At the time of his arrest he was working for a railroad, a job he had held since 2006.

Nevertheless, Clifton committed serious crimes against his teenage stepdaughter, and although he apologized to K.R. at sentencing and during the recorded phone call played at trial, the record indicates that he has not accepted responsibility for his actions. As part of the PSR, Clifton underwent a forensic adult psychosexual risk assessment with a psychologist. The psychologist wrote in his report that Clifton's veracity and believability were poor and that Clifton positioned himself as the victim of false allegations and disclosed that he felt that he was the victim in this case. The report also noted that Clifton displayed symptoms of narcissism and

self-assuredness and that at no point did he demonstrate any empathy for K.R. as a result of his behaviors.

Likewise, the probation officer who completed the PSR noted Clifton's evasiveness and denial of a majority of the questions related to his sexual history, and therefore, the officer had concerns about whether he was receiving truthful information in that regard. He further noted that Clifton displayed many traits and behaviors of having an antisocial personality disorder and was manipulative of the conversation with the probation officer, having to be frequently redirected to the original question. Clifton was resistant to provide any information that would negatively affect his demeanor and seemed to minimize the severity of the convicted charges.

K.R. authored a victim impact statement, which was included in the PSR. She detailed the effect Clifton's actions had on her life and described the ways in which Clifton's actions hurt her family, including her younger siblings, mother, uncle, and grandmother. She explained that even now, when she sees Clifton, she feels scared and physically reacts, up to and including panic attacks.

K.R.'s mother also authored a letter, describing how she felt to find out what her husband was doing to her daughter. She also explained the effect Clifton's actions have had on the entire family, writing that the two younger children are confused and unsure what to believe because they "have their sister's truth and the story their Dad tells them." She also observed that Clifton still refuses to take ownership of his actions or accept the fact that he has been found guilty and has left everyone to pick up all of the pieces in the mess that he created.

The district court made clear at sentencing that it considered the information contained in the PSR, the comments made at sentencing, and the required factors. There is no indication that the court did not meaningfully consider any mitigating factors contained in the record, including those Clifton highlighted at sentencing and here on appeal. Therefore, based on the record before us, we cannot find that the sentences imposed constitute an abuse of discretion.

CONCLUSION

Having found that the district court did not err in finding sufficient evidence to sustain the convictions, overruling Clifton's objection to a jury instruction, and in the sentences imposed, we affirm the convictions and sentences.

AFFIRMED.